CITY OF DALLAS, Petitioner,

v.

Heather STEWART, Respondent.

No. 09–0257.

Supreme Court of Texas.

Argued Feb. 16, 2010.

Decided Jan. 27, 2012.

Dissenting Opinions Filed July 1, 2011

Thomas P. Perkins Jr., Dallas City Attorney, Patricia Medrano De La Garza,

Christopher D. Bowers, Assistant City Attorney, Charles S. Black Jr., Duncanville, John K. Dunlap, Gwinn & Roby, Kelley Elise Cash, Thompson & Knight LLP, Johnanna Greiner, Dallas City Attorney's Office, Dallas, Barbara E. Rosenberg, James B. Pinson, Assistant City Attorney, for City of Dallas.

Julius Staev, Law Offices of Julius S. Staev, Dallas, for Heather Stewart.

Frederick Wayne 'Fritz' Quast, Taylor Olson Adkins Sralla & Elam LLP, Fort Worth, for Amicus Curiae The Cities of Aledo.

Jose Ines Nino, Deputy City Attorney, for Amicus Curiae City of San Antonio, Texas.

Donna Lynn Edmundson, Houston, for Amicus Curiae City of Houston, Texas.

Rance L. Craft, Office of the Attorney General, Austin, for Amicus Curiae Office of the Solicitor General of Texas.

Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice MEDINA, Justice WILLETT, and Justice LEHRMANN.

We deny the motion for rehearing. We withdraw our opinion of July 1, 2011 and substitute the following in its place.

Urban blight threatens neighborhoods. Either as a risk to public health or as a base for illicit activity, dilapidated structures harm property values far more than their numbers suggest. Cities must be able to abate[1] these nuisances to avoid disease and deter crime. But when the government sets up a mechanism to deal with this very real problem, it must nonetheless comply with constitutional mandates that protect a citizen's right to her property.

Today we hold that a system that permits constitutional issues of this importance to be decided by an administrative board, whose decisions are essentially conclusive, does not correctly balance the need to abate nuisances against the rights accorded to property owners under our constitution. In the context of a property owner's appeal of an administrative nuisance determination, independent court review is a constitutional necessity. We affirm the court of appeals' judgment, but on different grounds.

## I. Background

Heather Stewart bought a home in Dallas. Between 1991, when Stewart abandoned her house, and 2002, when the City demolished it, the Stewart home was a regular stop for Dallas Code Enforcement officials. Although utilities were disconnected and windows boarded up, the home suffered vandalism in 1997 and was occasionally occupied by vagrants. Stewart did little to improve the property, apart from building a fence to impede access, and she consistently ignored notices from the City. Inspectors returning to the home often found old notices left on the door.

In September 2001, the Dallas Urban Rehabilitation Standards Board ("URSB" or "Board"), a thirty-member administrative body that enforces municipal zoning ordinances, met to decide whether Stewart's property was an urban nuisance that should be abated. Stewart's neighbor, who had registered complaints on six prior occasions, testified that a fallen tree on Stewart's property had done $8,000 dam-

---

1. In the context of nuisance law, "abate" means to "eliminat[e] or nullify[]." BLACK'S LAW DICTIONARY 3 (9th ed.2009). Municipalities have, within their police powers, authority to abate nuisances, including the power to do so permanently through demolition. *See Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 286–87 (Tex.2004).

age to her home and threatened to do $30,000 more. The Board reviewed prior complaints about the property and its general disrepair, found the Stewart house to be an urban nuisance, and ordered its demolition. In September 2002, the Board denied Stewart's request for rehearing and affirmed its order.

On October 17, 2002, a City inspector found that Stewart had not repaired the property, and on October 28, the City obtained a judicial demolition warrant. The City demolished the house four days later.

Before the demolition, Stewart appealed the Board's decision to district court, but the appeal did not stay the demolition order. *See* Tex. Loc. Gov't Code § 54.039(e). After the demolition, Stewart amended her complaint to include a due process claim and a claim for an unconstitutional taking. The trial court, on substantial evidence review, affirmed the Board's finding that Stewart's home was an urban nuisance and awarded the city $2,266.28 in attorneys fees. It then severed Stewart's constitutional claims and tried them to a jury. At the close of trial, the City moved unsuccessfully for a directed verdict on the grounds that the Board's nuisance determination was res judicata, precluding Stewart's takings claim. The

jury rejected the City's contention that Stewart's home was a public nuisance and awarded her $75,707.67 for the destruction of her house.[2] The trial court denied the City's post-verdict motions and signed a judgment in conformance with the verdict.

The court of appeals affirmed but held that the Board's nuisance finding could not be preclusive because of the brief delay between the nuisance finding and the house's demolition. 360 S.W.3d at 518.[3] The City petitioned this Court for review, arguing that the lower courts erred in failing to give the Board's nuisance determination preclusive effect in Stewart's taking claim. We granted the petition for review.[4] 53 Tex.Sup.Ct.J. 115 (Nov. 20, 2009).

## II. Analysis

Texas law permits municipalities to establish commissions to consider violations of ordinances related to public safety. *See* Tex. Loc. Gov't Code §§ 54.032–.041; *see also id.* §§ 214.001–.012.[5] The City of Dallas created the now-defunct Urban Rehabilitation Standards Board for that purpose. *See* Dallas, Tex., Code §§ 27–6 to – 9, *repealed by* Dallas, Tex., Ordinance 26455 (Sept. 27, 2006).[6] The Board evalu-

2. The trial court instructed the jury that, in determining whether Stewart's property was a nuisance in the context of her takings claim, it could consider prior administrative and judicial findings.

3. This holding was based on *City of Houston v. Crabb*, 905 S.W.2d 669, 674 (Tex.App.-Houston [14th Dist.] 1995, no writ), which held that in order to demolish a building as a nuisance, a City must prove that it was a nuisance on the day of demolition.

4. The cities of Houston and San Antonio submitted a brief as amicus curiae in support of the City, as did the cities of Aledo, Granbury, Haltom City, Kennedale, Lake Worth, North Richland Hills, River Oaks, Saginaw, and Southlake. We also called for the views of

the Solicitor General, who submitted a brief on behalf of the State of Texas as amicus curiae.

5. Chapters 54 and 214 of the Local Government Code provide substantially similar authority to municipalities with regard to the regulation and abatement of urban nuisances.

6. This repealing ordinance abolished the URSB, replacing it with a system wherein municipal judges make the initial nuisance determination subject to substantial evidence review in district court. *See* Dallas, Tex., Code §§ 27–16.3, 27–16.10. However, the Dallas Code still contains language permitting administrative nuisance determinations reviewable only under a substantial evidence standard. *Id.* § 27–16.20.

ated alleged violations of municipal ordinances. DALLAS, TEX., CODE §§ 27–6(a), 27–7, 27–8. Before issuing a demolition order, the Board was required to give property owners notice and a hearing. *See id.* §§ 27–9, 27–13. Property owners were also entitled to an appeal in district court, but judicial review was limited to deciding whether substantial evidence supported the Board's decision. *Id.* § 27–9(e).

■■■ The Local Government Code authorizes substantial evidence review of standards commissions' decisions. TEX. LOC. GOV'T CODE §§ 54.039(f), 214.0012(f). The same standard governs review of State agency determinations under the Texas Administrative Procedure Act. *See* TEX. GOV'T CODE §§ 2001.174–.175 ("If the law authorizes review of a decision in a contested case under the substantial evidence rule *or if the law does not define the scope of judicial review,* a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence...." (emphasis added)). Substantial evidence review is limited in that it requires " 'only more than a mere scintilla,' to support an agency's determination." *Montgomery Indep. Sch. Dist. v. Davis,* 34 S.W.3d 559, 566 (Tex.2000) (quoting *R.R. Comm'n v. Torch Operating Co.,* 912 S.W.2d 790, 792–93 (Tex.1995)); *see also* W. Wendell Hall, *Standards of Review in Texas,* 38 ST. MARY'S L.J. 47, 290–92 (2006) (describing substantial evidence review as applied to Texas administrative agencies).

Substantial evidence review "gives significant deference to the agency" and "does not allow a court to substitute its judgment for that of the agency." *Torch Operating,* 912 S.W.2d at 792. As such, "the evidence in the record actually may preponderate against the decision of the agency and nonetheless amount to substantial evidence." *Tex. Health Facilities Comm'n v. Charter Med.-Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984).

As a general matter, we have held that some agency determinations are entitled to preclusive effect in subsequent litigation. *See, e.g., Igal v. Brightstar Info. Tech. Grp., Inc.,* 250 S.W.3d 78 (Tex.2007) (applying res judicata to orders of the Texas Workforce Commission). Today, we must decide whether the Board's determination that Stewart's house was an urban nuisance,[7] and the affirmance of that decision on substantial evidence review, precludes a takings claim based on the demolition of that property. Because substantial evidence review of a nuisance determination resulting in a home's demolition does not sufficiently protect a person's rights under Article I, Section 17 of the Texas Constitution, we hold that the determination was not preclusive.

## A. Eminent Domain and Inverse Condemnation

■■ A city may not take a person's property without first paying just compensation. TEX. CONST. art. I, § 17(d).[8]

---

7. The Dallas Municipal Code defines an urban nuisance as "a premises or structure that is dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare." DALLAS, TEX., CODE § 27–3(24). This language comes directly from statute. *See* TEX. LOC. GOV'T CODE § 214.001(a)(1); *see also id.* § 54.012 ("A municipality may bring a civil action for the enforcement of an ordinance ... for the preservation of public safety ... [or] relating to the preservation of public health....").

8. Takings without just compensation are also prohibited by the United States Constitution. *See* U.S. CONST. amends. V, XIV. However, that constitution has no requirement of prepayment of compensation. *See Ruckelshaus v. Monsanto,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("The Fifth Amendment does not require that compensation precede the taking.").

Typically, when the government takes a person's property, it does so through condemnation proceedings. For more than 150 years, the Legislature has prescribed a thorough and consistent condemnation procedure. A district court appoints a board of commissioners to hear evidence about the public's need for the land and its value.[9] The board's decision is then subject to de novo review by the district court. An early statute, passed before the ratification of the present constitution, provided that

> if either party be dissatisfied with the decision of said Commissioners, he or they shall have the right to file a petition in the District Court, as in ordinary cases, reciting the cause of action and the failure to agree, and *such suit shall proceed to judgment as in ordinary cases.*

Act approved Feb. 8, 1860, 8th Leg., R.S., ch. 51, § 2, 1860 Tex. Gen. Laws 60, 61, *reprinted in 4 H.P.N. Gammel, The Laws of Texas 1822–1897*, at 1422, 1423 (Austin, Gammel Book Co. 1898) (emphasis added).[10] An almost identical judicial review provision appeared in the first Revised Civil Statutes. *See* TEX.REV.CIV. STAT. art. 4202 (1879). Today, condemnation proceedings are governed by chapter 21 of the Property Code, which retains the right to de novo review of the lay board's valuation decision. *See* TEX. PROP.CODE § 21.018 (If there is objection to the commissioners' decision, the district court shall "try the case in the same manner as other civil cases.").

■ Frequently, however, the government takes property without first following eminent domain procedures. In these cases, Texas law permits inverse condemnation suits, which are actions commenced by the landowner seeking compensation for the government's taking or damaging of his or her property through means other than formal condemnation. *See, e.g., City of Houston v. Trail Enters., Inc.*, 300 S.W.3d 736 (Tex.2009). While these cases are initiated by the landowner rather than the State, they are substantially similar to condemnation suits in most other ways. *See* John T. Cabaniss, *Inverse Condemnation in Texas—Exploring the Serbonian Bog*, 44 TEX. L.REV. 1584, 1585 n. 3 (1966) (While the parties are reversed, "[t]he rules of evidence and measure of damages . . . are much the same.").

Our earliest cases gave the Legislature extensive leeway in defining the remedies for a taking. In *Buffalo Bayou*, we held that

9. Like building standards commissions, the board of commissioners in a condemnation suit need not be made up of lawyers. *See* TEX. PROP.CODE § 21.014 (requiring that the commissioners in a condemnation suit need only be "disinterested freeholders who reside in the county"); TEX. LOC. GOV'T CODE § 54.033 (setting no requirements for members of building standards commissions).

10. This statute, however, did not govern all early condemnation cases. The State frequently gave railroad companies eminent domain powers. *See* Eugene O. Porter, *Railroad Enterprises in the Republic of Texas*, 59 SW. HIST. Q. 363 (1956) (describing the charters and eminent domain powers of early Texas railroad companies); Harry N. Scheiber, *Property Law, Expropriation, and Resource Allocation by Government: The United States, 1789–1910*, 33 J. ECON. HIST. 232, 237 (1973) ("Devolution of the eminent-domain power upon . . . railroad companies was done in every state."). In some cases, the charters of these individual railroad companies prescribed somewhat different procedures than were found in the general statutes. *See, e.g., Buffalo Bayou, Brazos & Colo. R.R. Co. v. Ferris*, 26 Tex. 588 (1863); *see also Sabine River Auth. v. McNatt*, 161 Tex. 551, 342 S.W.2d 741, 746 (1961) (upholding, against a constitutional challenge, a condemnation statute that permitted only judicial review de novo without a jury).

[i]t cannot . . . be maintained, as is insisted, that the manner of ascertaining and assessing the amount of compensation . . ., as prescribed by the act of the legislature granting appellants their charter, is unconstitutional, because it does not require or authorize such compensation to be determined by the findings of a jury. . . . [T]he constitution does not prescribe a rule for determining what constitutes adequate compensation. It may be done in any manner that the legislature in its discretion may prescribe. . . .

26 Tex. at 599. This decision, however, came at a time when sovereign immunity was thought to apply even to takings claims. *See Ex parte Towles*, 48 Tex. 413, 447–48 (1878) (Gould, J., dissenting) (noting that the Legislature had assumed, and the Court had recognized, the State's sovereign immunity from inverse condemnation suits). Moreover, at the time of *Buffalo Bayou*, the Takings Clause of the Texas Constitution was generally thought not to be self-executing. *See Cabaniss*, 44 TEX. L.REV. at 1586–87 & n. 16.

■ Our decision in *Steele v. City of Houston*, 603 S.W.2d 786 (Tex.1980), brought significant change to this area of law. In *Steele*, the Houston Police Department, attempting to apprehend escaped fugitives who had taken refuge in Steele's property without his knowledge, destroyed his property. *Steele*, 603 S.W.2d at 789. When Steele sued the City under the Takings Clause, the City moved for summary judgment on the basis of its immunity from suit. *Id.* at 788. The trial court granted summary judgment and the court of civil appeals affirmed. *Id.* Reversing, we wrote:

It is our opinion that plaintiffs' pleadings and their claim in contesting the motion for summary judgment established a lawful cause of action under [the Tak-

ings Clause]. That claim was made *under the authority of the Constitution* and was not grounded upon proof of either tort or a nuisance. It was a claim for the destruction of property, and governmental immunity does not shield the City of Houston. *The Constitution itself is the authorization for compensation for the destruction of property and is a waiver of governmental immunity for the taking, damaging or destruction of property for public use.*

*Id.* at 791 (emphasis added). *Steele* recognized that the Takings Clause is self-executing—that it alone authorizes suit, regardless of whether the Legislature has statutorily provided for it. *See id.* Takings suits are thus, fundamentally, *constitutional* suits and must ultimately be decided by a court rather than an agency. Agencies, we have held, lack the ultimate power of constitutional construction. *See Central Power & Light Co. v. Sharp*, 960 S.W.2d 617, 618 (Tex.1997) (holding that constitutional claims need not be brought before an agency because "the agency lacks the authority to decide [those] issue[s]"); 1 RONALD L. BEAL, TEXAS ADMINISTRATIVE PROCEDURE & PRACTICE § 9.3.1[c] (2011) ("No Texas agency has been granted the power to engage in constitutional construction, and any such attempt by the legislature to vest such power would raise serious and grave issues of a separation of powers violation."); *but cf.* TEX. CONST. art. XVI, § 50(u).

■ Texas has generally recognized this rule. Agency findings in eminent domain cases are subject to de novo trial court review, and inverse condemnation plaintiffs bring their cases in the same manner as any other civil case. The City and the dissents urge us to insulate one type of takings claim from the protections of *Steele*: those in which an agency has first declared the property a nuisance. We do

not believe, however, that this matter of constitutional right may finally rest with a panel of citizens untrained in constitutional law.

## B. The Police Power and Nuisance Abatement

■ A maxim of takings jurisprudence holds that "all property is held subject to the valid exercise of the police power." *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984) (citing *Lombardo v. City of Dallas*, 124 Tex. 1, 73 S.W.2d 475, 478 (1934)). Based on this principle, we have long held that the government commits no taking when it abates what is, in fact, a public nuisance. *See City of Texarkana v. Reagan*, 112 Tex. 317, 247 S.W. 816, 817 (1923). Nuisance determinations are typically dispositive in takings cases.[11] Indeed, that was the case here: except for damages, the only relevant question for the jury was whether Stewart's home constituted a public nuisance.

■ Our precedents make clear that nuisance determinations must ultimately be made by a court, not an administrative body, when the property owner contests the administrative finding. *See City of Houston v. Lurie*, 148 Tex. 391, 224 S.W.2d 871 (1949); *City of Texarkana v. Reagan*, 112 Tex. 317, 247 S.W. 816 (1923); *Crossman v. City of Galveston*, 112 Tex. 303, 247 S.W. 810 (1923); *Stockwell v. State*, 110 Tex. 550, 221 S.W. 932 (1920).[12] In *Stockwell*, a statute empowered the Commissioner of Agriculture to abate as nuisances any trees infested with an "injurious insect" or a "contagious disease of citrus fruits." *See Stockwell*, 221 S.W. at 934. The Commissioner exercised this legislatively granted discretion and ordered Stockwell's hedges destroyed because they were infested with citrus canker, which the Commissioner determined fit the statutory definition. *Id.* We held that a court must ultimately pass on that determination, noting that "whether something not defined as a public nuisance by the statute is such under its general terms, is

---

11. *See, e.g., Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (noting that a claimant cannot recover under a regulatory takings theory if state law would have deemed the claimant's activities a public nuisance); *Vulcan Materials Co. v. City of Tehuacana*, 369 F.3d 882, 893–94 (5th Cir.2004) (finding that the *Lucas* rule applies under Texas law); *RBIII, L.P. v. City of San Antonio*, No. SA–09–CV–119–XR, 2010 WL 3516180, at *12–13, 2010 U.S. Dist. LEXIS 91751, at *42 (W.D.Tex. Sept. 3, 2010) (applying *Vulcan* and *Lucas*); *City of Texarkana v. Reagan*, 112 Tex. 317, 247 S.W. 816, 817 (1923) (noting that a showing that a structure was in fact a nuisance would be a valid defense to a suit for damages based on an allegedly improper demolition of the structure); *City of Dallas v. Wilson*, 602 S.W.2d 113, 115 (Tex.Civ.App.-Dallas 1980, no writ) (same); *Jones v. City of Odessa*, 574 S.W.2d 850, 853 (Tex.Civ.App.–El Paso 1978, writ ref'd n.r.e.) (same).

12. JUSTICE GUZMAN casts these opinions narrowly to create a "general rule" that would never apply in practice. She would hold that de novo review is required only where the agency acts without, a statutory nuisance definition or, a statute requiring substantial evidence review. The Legislature has defined nuisance, *see* TEX LOC GOV'T CODE § 214.001, and it has required substantial evidence review for boards like the URSB specifically, *id.* § 214.0012(f), and for review of agency decisions generally, *see* TEX. GOV'T CODE § 2001.175(a). The Legislature has, therefore, evaded JUSTICE GUZMAN's "general rule," which would be unlikely ever to apply again.

Moreover, these cases stand for a broader proposition. In each case, there was statutory authorization for the nuisance finding, and substantial evidence review was already considered the default standard. What these cases in fact stand for, then, is that a court, not an administrative agency, must apply statutory nuisance standards to the facts of a particular case.

undoubtedly a judicial question." *Id.* at 934.

Stewart's home was declared an urban nuisance according to similarly broad terms. The Local Government Code's nuisance definition prohibits buildings that are "dilapidated," "substandard," or "unfit for human habitation." TEX. LOC. GOV'T CODE § 214.001(a)(1). Like the application of the phrase "contagious disease of citrus fruits," these terms require more than rote application by an agency; they require an assessment of whether the particular conditions—citrus canker in one case, foundation damage in another—meet the general statutory terms. Judicial review in nuisance cases requires the application of general statutes to specific facts.[13] *See Stockwell,* 221 S.W. at 935 (quoting COOLEY'S CONSTITUTIONAL LIMITATIONS 742 ("Whether any particular thing or act is or is not permitted by the law of the State must always be a judicial question, and therefore the question of what is and what is not a public nuisance must be judicial, and it is not competent to delegate it to the local legislative or administrative boards.")).

We adopted this view of *Stockwell* in *Crossman,* writing that *Stockwell* refused to "sustain the validity of [a] statute, in so far as its effect was to deny a hearing before the courts on the question as to whether or not the particular trees involved constituted a nuisance which ought to be summarily destroyed." *Crossman,* 247 S.W. at 813. That is, judicial review was necessary in *Stockwell* because a general statutory term had to be applied to specific facts. We wrote:

> A wooden building . . . is not a nuisance per se. It can only become a nuisance by the use to which it is put or the state of repair in which it is maintained; but as to whether or not it is, even in these events, a nuisance *is a justiciable question, determinable only by a court of competent jurisdiction.*

*Id.* at 813 (emphasis added). To read this as negating a property owner's right to full judicial review is to reject the opinion's clear language.

*Reagan* is particularly on point. There, a statute in the form of the City's charter gave the City the power to abate "dilapidated" buildings as nuisances, and the City destroyed Reagan's property pursuant to this authority. The district court concluded that the City's determination was res judicata. We disagreed, holding that *a court* must determine whether a building is "in fact" a nuisance:

> [N]either the Legislature nor the City Council can by a declaration make that a nuisance which is not in fact a nuisance; and *the question as to whether or not the building here involved was a nuisance was a justiciable question, determinable alone by the court or jury trying the case.*

*Reagan,* 247 S.W. at 817 (emphasis added). JUSTICE GUZMAN suggests that the problem in *Reagan* was that the statute was not "circumscribed to specific conditions that constitute a nuisance in fact" but rather

---

**13.** The statute at issue in *Stockwell* did specifically permit the abatement of trees infected with, e.g., "nematode galls" or "crown galls." *See Stockwell v. State,* 110 Tex. 550, 221 S.W. 932, 934 (1920). Implicit in the opinion is a suggestion that, had the Commissioner abated trees infected with such diseases, judicial review would be unnecessary because there would have been no application of law to fact—merely rote application of statutory command. But, where the statutory term was more general, and the agency therefore had discretionary power, review was necessary. There is, of course, no suggestion that this is based on either the lack of a statutory definition—there is one—or the failure to prescribe a standard of review.

authorized abatement of buildings for merely being dilapidated. 361 S.W.3d at 566 & n. 7. But the statute at issue in this case also authorizes abatement of buildings for merely being dilapidated. *See* Tex. Loc. Gov't Code § 214.001(a)(1) (providing that a "municipality may, by ordinance, require the ... demolition of a building that is ... dilapidated"). Thus, the standards for demolition are the same,[14] and, as in *Reagan*, an aggrieved property owner is entitled to judicial review.

Finally, in *Lurie*, we stated that "[i]t has been repeatedly held that the question whether property is a public nuisance and may be condemned as such is a justiciable question to be determined by a court." *Lurie*, 224 S.W.2d at 874. We referred to the "important principle" announced by *Stockwell*, *Crossman*, and *Reagan* that "the property owner is not to be deprived of his right to a judicial determination of the question whether his property is a public nuisance to be abated by demolition." *Id.* at 875. Rather than give *Lurie* and its antecedents a needlessly narrow cast, we should take their broad statements of principle at face value.[15]

The City doubts *Lurie*'s continuing validity, relying on two cases from this Court which, it says, undermine the notion that a claim under the Takings Clause necessitates de novo trial court review. In *Brazosport Savings & Loan Ass'n v. American Savings & Loan Ass'n*, we held that substantial evidence review was appropriate where the plaintiff asserted that the State's issuance of a charter to a third party infringed on the plaintiff's due process property rights. 161 Tex. 543, 342 S.W.2d 747, 752 (1961). Then, in *City of Houston v. Blackbird*, we held that there was no right to a de novo trial after the city council had levied assessments against landowners' property for the costs of paving improvements. 394 S.W.2d 159, 162–

---

14. Cities are by statute permitted to demolish buildings that are, *inter alia*, "dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare." Tex. Loc. Gov't Code § 214.001(a)(1). Justice Guzman contends that the phrase "hazard to the public health, safety, and welfare" limits the word "dilapidated" and that, therefore, the statute only permits the demolition of nuisances in fact. This reading strain's the sentence's grammar and apparent meaning. The language after the word "or" constitutes a single phrase permitting abatement of buildings that are "unfit for human habitation and a hazard to the public health, safety, and welfare." Dilapidation and failure to comply with building standards are separate bases for abatement. This reading comports with the doctrine of last antecedent, which suggests that in most cases, a qualifying phrase should be applied only to the portion of the sentence "immediately preceding it." *See Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000).

Moreover, even if the final phrase did modify "dilapidated," that would not transform all URSB findings into findings that a property was, in fact, a nuisance "in fact." The Local Government Code's "hazard" language is exactly the same sort of "general term" that we said in *Stockwell* must be found by a court.

15. We should also recognize *Lurie*'s language about the lack of statutory authorization for substantial evidence review for what it was: bolstering. *See City of Houston v. Lurie*, 148 Tex. 391, 224 S.W.2d 871, 876 (1949) ("Certainly we would not be justified in applying the substantial evidence rule to this case when there is nothing in the statutes ... expressing an intention that the suit be tried under [the substantial evidence] rule."). Earlier in the opinion, we noted that in other circumstances substantial evidence was the default standard in the absence of express legislative guidance. *Id.* at 874. But, because of the special nature of the right in question, we refused to apply that default presumption. *Id.* Nothing in *Lurie* suggests that our conclusion would have been different had the Legislature expressly required substantial evidence review. To the contrary, the opinion's other language—its language of principle—suggests the opposite result.

63 (Tex.1965). Both cases are distinguishable.

Neither *Brazosport* nor *Blackbird* concerns nuisance determinations, and thus each says little about *Lurie*'s specific holding. Moreover, both predate our decision in *Steele*, which recognized an implied constitutional right of action for takings claims. *Steele*, then, undermined their vitality insofar as they give broad deference to the Legislature's determinations of remedial schemes for property rights violations. Finally, and most fundamentally, *Blackbird* and *Brazosport* do not concern agency decisions that directly determine substantive constitutional rights. Rather, they are due process cases alleging improper agency actions implicating property interests. *See Blackbird*, 394 S.W.2d at 161 (petitioners arguing that Houston did not follow the law in levying assessments against their property); *Brazosport*, 342 S.W.2d at 749 (respondent arguing that the agency acted "contrary to law and . . . rules"). *Blackbird* and *Brazosport* hold that in such cases, due process requires a right of appeal but note that substantial evidence review will usually be sufficient. *See Blackbird*, 394 S.W.2d at 163 (holding that agency action levying property assessments may only be overturned because it is "arbitrary or [is] the result of fraud"); *Brazosport*, 342 S.W.2d at 751 (holding that due process requires "a right of judicial review" where agency action affects property rights). So long as the agency complies with the requirements of due process, its substantive decision does not directly adjudicate a constitutional claim.

In *Blackbird*, for example, the Court made clear that a city has the power to assess property owners for improvements to their properties, but noted that an improperly supported assessment may run afoul of the Texas Constitution. *Blackbird*, 394 S.W.2d at 162. To the extent the Court held that the case implicated the Takings Clause, it was because of a belief that an improper assessment might constitute a taking. *Id.* The suit in *Blackbird* was thus not a takings suit but, instead, was a statutory suit contesting the assessments' grounds. *See id.* at 160. It alleged that the agency failed to follow the law, a violation of due process. *See, e.g., Bennett v. Reynolds*, 315 S.W.3d 867, 873 (Tex. 2010) (noting that arbitrary deprivations of property are violations of due process); *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 446 (Tex.2007) ("Due process requires that the application of Texas law be neither arbitrary nor fundamentally unfair."). This differs significantly from Stewart's takings suit, which deals with whether her property was taken without just compensation. For these reasons, the cases cited by the City do not displace our holding in *Lurie*. *See Sheffield Dev. Co., Inc. v. City of Glenn Heights*, 140 S.W.3d 660, 674 (Tex.2004) ("Prior decisions need not be reaffirmed periodically to retain authority.").

The City also relies on two federal cases for the proposition that *Lurie* has been undermined by the rise of the administrative state. *See Freeman v. City of Dallas*, 242 F.3d 642, 649 (5th Cir.2001) (en banc) (suggesting that plenary court review of nuisance determinations is "fundamentally at odds with the development of governmental administrative agencies"); *Traylor v. City of Amarillo*, 492 F.2d 1156, 1158 (5th Cir.1974) (suggesting that *Crossman* was "decided at a time when the constitutional basis for public regulatory powers was more primitive" (internal quotations omitted)). However, neither of these cases squarely addresses the issue currently before us, and neither directly addresses *Lurie* at all. *Traylor* was a case about whether a judicial nuisance determination must precede a property's demoli-

tion, not about judicial review of such determinations.

*Freeman,* too, is not directly on point. In *Freeman,* the petitioners, whose property was demolished, did not seek judicial review of the URSB's decision, and so the scope of that review was not at issue. *Freeman,* 242 F.3d at 646–47. Rather, *Freeman* considered whether the Fourth Amendment requires that a judicial warrant precede the permanent abatement of a nuisance. *Id.* at 647. *Freeman* cited our cases only to reject an analogy, apparently raised by the petitioners, between warrant requirements and judicial review of nuisance determinations. *Id.* at 649 (noting that the Texas judicial review cases "say nothing about employing the Warrant Clause" in this context). We do not believe the Circuit intended to decide the specific question before us today.

Moreover, neither *Traylor* nor *Freeman* addresses the Texas Constitution, under which we decide today's case. *See Freeman,* 242 F.3d at 654 (reaching its holding under the Fourth Amendment alone); *Traylor,* 492 F.2d at 1159 n. 4 ("We intend no reflection on the continuing validity under state law of the Texas decisions cited by appellants...."). Indeed, the *Freeman* dissent notes that "judicial oversight of public nuisance abatement ... is required by Texas jurisprudence." 242 F.3d at 665 (Dennis, J., dissenting) (citing *Lurie,* 224 S.W.2d at 874).

We consider today not only our Takings and Due Process Clauses, which are generally regarded as functionally similar to their federal counterparts, but also our Separation of Powers Clause, which has no explicit federal analogue. *See* TEX. CONST. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy....."). As in most states, separation of powers principles are ingrained in the Texas Constitution, while they are merely implied in the United States Constitution. *See* Harold H. Bruff, *Separation of Powers Under the Texas Constitution,* 68 TEX. L.REV. 1337, 1340 (1990); *see also* Neil C. McCabe, *Four Faces of State Constitutional Separation of Powers: Challenges to Speedy Trial and Speedy Disposition Provisions,* 62 TEMP. L.REV. 177, 185 (1989) ("The principle of separation of powers has evolved along parallel but distinctly different paths on the state and federal levels." (internal quotations omitted)). The scope of separation of powers is a function of governmental structure, and because of the differences between Texas and federal government, its requirements at the state level are different. This is especially true given its explicit treatment in our constitution. *See* Bruff, 68 TEX. L.REV. at 1348 (noting that the "prominence of Texas's constitutional command has given the separation-of-powers doctrine a special vigor in a number of respects"). In particular, the fragmentation of Texas's executive branch "attenuates" the accountability of our administrative agencies. *Id.* at 1346 ("The structure of Texas government permits the ties between a particular agency and each of the three branches of the state government to be weaker—sometimes far weaker—than they would be in the federal government."). Accountability is especially weak with regard to municipal-level agencies such as the URSB, which are created by cities that "typically lack the separation of powers of the state and federal governments."[16] *Id.* at 1355.

---

**16.** Individuals often have fewer statutory procedural protections before municipal agencies than they do before State agencies. *Compare* TEX. GOV'T CODE ch.2001 (enumerating the procedural protections required for contested case hearings conducted by State agencies),

For these reasons, the Fifth Circuit cases cited by the City have little relevance to our decision today, which must rely on the Texas Constitution and our precedent.[17]

## C. Agencies and Constitutional Construction

JUSTICE GUZMAN laments that we "miss[ ] the crux of the constitutional issue" before us. *See* 361 S.W.3d at 589. We agree that the "correct inquiry" is whether Stewart was afforded due process, *id.* at 590, but we cannot accept that the centrality of personal property rights, explicitly protected by two provisions of our constitution, has no bearing on the procedural requirements placed on an administrative agency when it adjudicates a question of direct constitutional import. Our opinion emphasizes the importance of an individual property owner's rights when aligned against an agency appointed by a City to represent the City's interests.[18] The character of the substantive rights protected, especially substantive constitutional rights, *must* be considered by a court determining what procedure is due. *Cf. Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (noting that, in determining what process is due, courts must pay close attention to the na-

ture of "the private interest that will be affected by the official action"); *see also Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (noting, with regard to the important relationship between procedural due process and substantive rights, that "the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures").

In a takings case, a nuisance finding generally precludes compensation for the government's destruction of property. That is so because due compensation is typically a matter "determined by whether the conduct of the sovereign is classified as a noncompensable exercise of the police power or a deprivation of property through eminent domain." Cabaniss, 44 TEX. L.REV. at 1584 n. 1. The nuisance determination, therefore, cannot be characterized as somehow apart from the takings claim, because the only sense in which such a determination is significant—its only meaning—is that it gives the government the authority to take and destroy a person's property *without compensation.* Nuisance findings are "determination[s]—

---

*with* TEX. LOC. GOV'T CODE ch. 54, subch. C (permitting the creation of municipal building and standards commissions and defining the scope of their powers).

**17.** It is also worth noting that *Traylor*, on which *Freeman* relies, predates both our decision in *Steele* as well as the reinvigoration by the Supreme Court of the constitutional fact cases, discussed below.

**18.** Abatement actions are often motivated, at least in part, by a city's bottom line. *See* Nicole Stella Garnett, *Ordering (and Order in) the City*, 57 STAN. L.REV. 1, 12–13 (2004) ("Blighted properties contribute to a city's economic problems by discouraging neighborhood investment, depriving the city of tax revenue, lowering the market value of neighborhood property, and increasing the cost of

business and homeowner insurance." (footnotes omitted)); *see also Freeman v. City of Dallas*, 242 F.3d 642, 667 (5th Cir.2001) (en banc) (Dennis, J., dissenting) ("The City of Dallas has pecuniary interests in the outcome of [abatement] proceedings, e.g., justification for federal and state urban renewal grants; enhancement of the municipal tax base by promoting the replacement of old buildings with new ones."); *id.* at 664 ("The URSB is an agency of the City of Dallas charged with the remediation—including the demolition—of structures deemed by it to constitute urban nuisances. The URSB's job is to eliminate unsightly conditions adversely affecting the economic value of neighboring property and the City's tax base.").

in constitutional terms—that the structure has no value at all." D.R. Mandelker, *Housing Codes, Building Demolition, and Just Compensation: A Rationale for the Exercise of Public Powers Over Slum Housing*, 67 MICH. L.REV. 635, 639 (1969). Specifically, the issue before us is whether, *in Stewart's takings claim*, the URSB's nuisance determination is res judicata. That is, should it have been a dispositive affirmative defense to her claim?[19] The nuisance finding is thus a value determination, like the value determination made by the board of commissioners in an eminent domain case. The board of commissioner's value determination, of course, is subject to de novo review in a trial court;[20] so, too, is the URSB's value determination in this case.[21]

Moreover, though the value determination that the board of commissioners makes in an eminent domain suit is wholly factual, based on market conditions and similar factors, it is given no weight on appeal to the trial court. The value determination the URSB made here, however, was largely a determination of law based on the application of statutory standards to historical facts. Such a determination is less, not more, appropriate for deferential agency review.

 This is especially true because of the constitutional nature of the nuisance inquiry. In *Steele*, we observed that the law had "moved beyond the earlier notion that the government's duty to pay for taking property rights is excused by labeling the taking as an exercise of the police powers," *Steele*, 603 S.W.2d at 789, because the line between police power and takings is "illusory" and requires "a careful analysis of the facts ... in each case of this kind." *Turtle Rock*, 680 S.W.2d at 804; *see also Parking Ass'n v. City of Atlanta*, 515 U.S. 1116, 1118, 115 S.Ct. 2268, 132 L.Ed.2d 273 (1995) (Thomas, J., dissenting) (referring to the "fact-specific nature of takings claims"). Because a nuisance determination is an exercise of the police power, it, *like any other determination regarding the police power*, "is a

---

**19.** For this reason, JUSTICE GUZMAN's suggestion that, as an initial matter, this case falls outside the Takings Clause is peculiar. This case is outside the Takings Clause only if the property was *in fact* a nuisance and properly found as such. If the jury's failure to find that Stewart's property was a nuisance controls, then there was a taking. This case must therefore be analyzed with Takings Clause in mind.

**20.** TEX. PROP.CODE § 21.018(b) (requiring that appeals from the board of commissioners' findings be tried "in the same manner as other civil causes").

**21.** JUSTICE GUZMAN fails to articulate any logical reason for treating review of these two types of administrative valuation differently. We agree with JUSTICE GUZMAN that proper abatement has always required that the property be a nuisance in fact. But if this standard applies to all governmental action with respect to nuisances, why does the scope of review turn on whether the Legislature told the agency about the standard? The nuisance

in fact requirement is a common law norm limiting all governmental exercise of the police power. Statute or no, the question is the same. So must be the standard of review.

The differing treatment of decisions of the URSB and condemnation commissioners is particularly notable considering that the board of commissioners in an eminent domain case is appointed by the trial court, TEX. PROP.CODE § 21.014(a) (requiring that the commissioners be appointed by the "judge of a court in which a condemnation petition is filed or to which an eminent domain case is assigned"), and therefore could be considered its agent. *Cf. N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 77, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (approving of the use of magistrate judges as adjuncts to Article III courts). The agency here, though, is appointed by the City that is taking the property. DALLAS, TEX., CODE § 27–6, *repealed by* Dallas, Tex., Ordinance 26455 (Sept. 27, 2006).

question of law and not fact" that must be answered based upon a "fact-sensitive test of reasonableness." *Turtle Rock,* 680 S.W.2d at 804; *see also Sheffield,* 140 S.W.3d at 671 (observing that " '[c]ases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law' " (quoting *Eastern Enters. v. Apfel,* 524 U.S. 498, 541, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (alteration in original))). We have even refused to give substantial deference to our lower courts when they make similar determinations. In *Mayhew v. Town of Sunnyvale,* we noted that while "determining whether a property regulation is unconstitutional requires the consideration of a number of factual issues," we do not grant deference because, "[w]hile we de-

pend on the district court to resolve disputed facts regarding the extent of governmental intrusion on the property, the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *Mayhew,* 964 S.W.2d 922, 932–33 (Tex.1998) (citation omitted). Thus, in the takings context, we may grant deference to findings of historical fact, but mixed questions of law and constitutionally relevant fact—like the nuisance determination here—must be reviewed de novo.

Cases from the United States Supreme Court provide further guidance. In a recent line of cases, that Court has reinvigorated the constitutional fact doctrine,[22] especially as it relates to appellate review of state and lower federal court decisions. *See, e.g., Bose Corp. v. Consumers Union*

---

**22.** The original "constitutional fact" cases dealt with review of administrative decisions implicating constitutional claims. *See* Henry P. Monaghan, *Constitutional Fact Review,* 85 COLUM. L.REV. 229, 247–63 (1985). In an especially relevant case involving a confiscation challenge to a public utility rate order, the Supreme Court required plenary court review of constitutionally relevant facts. *See Ohio Valley Water Co. v. Ben Avon Borough,* 253 U.S. 287, 40 S.Ct. 527, 64 L.Ed. 908 (1920). Central to the dispute in *Ben Avon* was the question of the value of the utility's property. *See id.* at 288, 40 S.Ct. 527. The Supreme Court held that the utility was entitled to independent judicial judgment on a question, such as this, which implicated the Takings Clause. *Id.* at 290–91, 40 S.Ct. 527. *Ben Avon* itself supports for our holding today. Though it has not been recently cited for its original holding, it has also never been overruled. *See Sheffield,* 140 S.W.3d at 660 (quoting *Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("[I]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [a lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of its own decisions.") (citation omitted) (alterations in original)). We decide today's case under the Texas Constitution, and, thus, Supreme Court precedent does not control, but because of

the similarities between the United States Constitution and that of our state, it is authority of the utmost persuasiveness. *See id.* (noting that even where a takings decision is made under the Texas Constitution, "we do look to federal takings cases for guidance in applying our own constitution").

The constitutional fact doctrine was affirmed in *Crowell v. Benson,* 285 U.S. 22, 56–58, 52 S.Ct. 285, 76 L.Ed. 598 (1932), where the Court held that constitutional facts must be found by a court. *See also Monaghan,* 85 COLUM. L.REV. at 253 (noting that in *Crowell,* the Court "confirmed and generalized the constitutional fact doctrine in strong terms"). After *Crowell,* though, the constitutional fact doctrine fell into relative desuetude. *See* Adam Hoffman, Note, *Corralling Constitutional Fact: De Novo Fact Review in the Federal Appellate Courts,* 50 DUKE L.J. 1427, 1449 (2001); *see also N. Pipeline,* 458 U.S. at 82 n. 34, 102 S.Ct. 2858 (*"Crowell* 's precise holding, with respect to 'jurisdictional' and 'constitutional' facts that arise within ordinary administrative proceedings, has been undermined by later cases."). *But see Gonzales v. Carhart,* 550 U.S. 124, 165, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007) (approvingly citing *Crowell* for the proposition that the Supreme Court "retains an independent constitutional duty to review factual findings where constitutional rights are at stake").

*of U.S., Inc.,* 466 U.S. 485, 510–11, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (holding, as "a rule of federal constitutional law," that appellate courts must give independent, de novo review to lower court determinations of actual malice in defamation cases, despite contrary statute). The reasoning of these cases applies with even greater force to agency decisions because while state and lower federal courts are presumed competent to handle constitutional matters, administrative agencies, for all the deference they are typically given, occupy a subordinate status in our system of government. *See* Henry P. Monaghan, *Constitutional Fact Review,* 85 COLUM. L.REV. 229, 239 (1985) (noting that in the context of administrative agencies, "a strong argument can be made that enforcement tribunals *must* undertake constitutional fact review" for reasons "rooted in the 'legitimacy deficit' inherent in administrative adjudication."); *see also* Richard H. Fallon, Jr., *Legitimacy and the Constitution,* 118 HARV. L. REV. 1787, 1842–47 (2005) (noting that administrative agencies can be thought to suffer from problems of legal, sociological, and moral illegitimacy).[23]

The Supreme Court has required constitutional fact review primarily in the context of the First and Fourth Amendments. In those areas, facts tend to be deeply intertwined with legal issues, necessitating independent review. In *Miller v. Fenton,* 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the Supreme Court noted that where "the relevant legal principle can be given meaning only through its application to the particular circumstances of a case," it is "reluctant to give the trier of fact's conclusions presumptive force...." The *Miller* Court considered whether it was required to defer to a trial court's determination that a confession was voluntary. *Id.* at 105–06, 106 S.Ct. 445. The Court rejected that approach, holding that voluntariness was a fact-specific, but nonetheless legal, determination. *Id.* at 116, 106 S.Ct. 445 ("[T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne."). Similarly, in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 567, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), the Court held that determinations of whether an activity constitutes free speech, protected by the First Amendment, carry with them "a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court." This independent review is required because "the reaches of the First Amendment are ultimately defined by the facts it is held to embrace," and so a reviewing court "must thus decide for [itself] whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Id.* And in

---

**23.** Indeed, according to Professor Monaghan,

> [i]n terms of the constitutional design, the whole process of substituting administrative for judicial adjudication may be thought to suffer from a serious "legitimacy deficit." The constitutional fact doctrine is an effort to overcome this problem, to reconcile the imperatives of the twentieth century administrative state with the constitutional preference for adjudication by the regular courts.

> It does so by requiring, at a minimum, that a court asked to enforce an administrative order must engage in constitutional fact review.

Monaghan, 85 COLUM. L.REV. at 262 (footnote omitted); *see also* Richard H. Fallon, Jr., *Legitimacy and the Constitution,* 118 HARV. L.REV. 1787, 1844 (2005) (noting that the sociological legitimacy deficit of administrative agencies is "serious, even alarming").

*Ornelas v. United States,* 517 U.S. 690, 695–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the Supreme Court held that appellate courts must independently determine what constitutes "reasonable suspicion" and "probable cause." Again, the mixed nature of questions of law and findings of constitutional fact were controlling:

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible.... They are.... fluid concepts that take their substantive content from the particular context in which the standards are being assessed. The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. *The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact....*

*Id.* at 695–96, 116 S.Ct. 1657 (citations omitted) (emphasis added).

**24.** E.g., did the damage to the structure make it a threat to public health or safety such that the government may deprive a citizen of her ownership of the structure?

**25.** Our holding today is restricted to judicial review of agency decisions of substantive constitutional rights, and thus, despite Justice Guzman's assertions to the contrary, 361 S.W.3d at 598, it does no violence to the general rule that trial court decisions on mixed questions of fact and law are reviewed for abuse of discretion. *See State v. $217,590 in U.S. Currency,* 18 S.W.3d 631, 633 (Tex. 2000). We note, however, that we have already recognized the existence of exceptions to that rule on the basis of the constitutional concerns. For example, Texas appellate courts follow *Bose's* requirement that they independently review trial court findings of actual malice in defamation cases. *Sw. Bell Tel. Co. v. Garza,* 164 S.W.3d 607, 623–24

Takings claims also typically involve mixed questions of fact and law. *See Mayhew,* 964 S.W.2d at 932–33. An analysis of whether a structure is a nuisance requires fairly subtle consideration. There are initial questions of historical fact—whether or not the structure had foundation damage, for example. These questions are within the competence of the administrative agency and are accorded deference. But the second-order analysis, which applies those historical facts to the legal standards,[24] are questions of law that determine the constitutionality of a property's demolition. *See id.* These legal-factual determinations are outside the competence of administrative agencies.[25]

Indeed, we have held that an agency's adjudicative power is strongest where it decides purely statutory claims and weakest where it decides claims derived from the common law. *Compare Emps. Ret. Sys. of Tex. v. Duenez,* 288 S.W.3d 905, 910 (Tex.2009) (refusing to construe a statute to permit an agency to decide subrogation claims because those

(Tex.2004); *Turner v. KTRK TV., Inc.,* 38 S.W.3d 103, 120 (Tex.2000) ("Federal constitutional law dictates our standard of review on the actual malice issue, which is much higher than our typical 'no evidence' standard of review."). Likewise, we have repeatedly left open the question of whether the constitution requires de novo review in parental termination cases. *See In re J.F.C.,* 96 S.W.3d 256, 267–68 (Tex.2002); *In re C.H.,* 89 S.W.3d 17, 29 (Tex.2002) (Hecht, J., concurring). And in *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 932–33 (Tex.1998), we refused to defer to the trial court's determination of factual issues in a regulatory takings case because "the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law." *See also Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 307–08 & n. 34 (Tex.2006) (noting that the constitution requires de novo review of the constitutionality of punitive damage awards).

claims "existed at common law long before [the agency] was created"), *with Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 227 (Tex.2002) (permitting an agency to decide claims arising "from a statute and not the common law"). The protections we have previously provided to common law claims should apply with special force to claims founded in our constitution, because the power of constitutional construction is inherent in, and exclusive to, the judiciary. *See Firemen's & Policemen's Civil Serv. Comm'n v. Kennedy,* 514 S.W.2d 237, 239 (Tex.1974) (holding that courts may consider the constitutionality of agency action even where judicial review is not provided for by statute).

Many agencies make decisions that affect property interests—such as licensure and rate setting—but in so doing they do not actually engage in constitutional construction. *See* 1 BEAL, TEXAS ADMINISTRATIVE PROCEDURE & PRACTICE § 9.3.1[c]. Rather, constitutional challenges to agency decisions typically deal not with the substance of the agency's decision but, rather, with the procedures that the agency followed in making it. *See, e.g., Blackbird,* 394 S.W.2d 159; *Brazosport,* 161 Tex. 543, 342 S.W.2d 747. The rules governing such procedural challenges are already well established. *Kennedy,* 514 S.W.2d at 239. Thus, all that is before the us today is agency authority to *actually decide* substantive constitutional claims.

### III. Response to Motion for Rehearing

The City and a number of amici[26] urge us to grant rehearing. They argue that failing to accord administrative nuisance determinations preclusive effect will open the floodgates for takings claims. Because takings claims have a ten-year statute of limitations, they contend, parties will now sue to challenge demolitions that occurred any time in the past ten years. Finally, the amici assert that our decision effectively eliminates administrative nuisance abatement because cities lack the resources to file suit to abate every nuisance.

These arguments overlook three key facts. First, takings claims must be asserted on appeal from the administrative nuisance determination. Although agencies have no power to preempt a court's constitutional construction,[27] a party asserting a taking must first exhaust its administrative remedies and comply with jurisdictional prerequisites for suit. We recently explained that a litigant must avail itself of statutory remedies that may moot its takings claim, rather than directly institute a separate proceeding asserting such a claim. *See City of Dall. v. VSC,* 347 S.W.3d 231, 234–37 (Tex.2011). We held that "if a remedial procedure might have obviated the need for a takings suit, then the property simply had not, prior to the procedure's use, been taken *without just compensation." Id.* at 237. We apply the same rationale here. Had Stewart convinced the URSB that her property was not a nuisance, the City would not have obtained a demolition order, and Stewart's takings claim would fail. Because she was unsuccessful before the Board, she properly asserted her takings claim on appeal to district court.

---

26. The International Municipal Lawyers Association, the Texas City Attorneys Association, the Texas Municipal League, and the Cities of Abilene, Aledo, Cleburne, Euless, Fort Worth, Garland, Granbury, Haltom City, Houston, Irving, Kennedale, Lake Worth, McAllen, Mesquite, North Richland Hills, River Oaks, Saginaw, San Antonio, Southlake, and Sulphur Springs have submitted amicus curiae briefs in support of the City's motion for rehearing.

27. *Cent. Power & Light Co. v. Sharp,* 960 S.W.2d 617, 618 (Tex.1997).

■ Thus, as one commentator has noted, "even though [a constitutional] claim may be asserted for the first time in the district court upon appeal of the agency order, a failure to comply with the appeal deadlines and/or the failure to so assert the constitutional claim at that time, precludes a party from raising the issue in a separate proceeding." 1 BEAL, TEXAS ADMINISTRATIVE PRACTICE AND PROCEDURE § 9.3.1[c]; *see also Tex. Comm'n on Envtl. Quality v. Kelsoe*, 286 S.W.3d 91, 97 (Tex. App.-Austin 2009, pet. denied) (holding that a party making a constitutional claim must nonetheless comply with statutory prerequisites for judicial review). A party cannot attack collaterally what she chooses not to challenge directly. Cities are not, therefore, subject to new takings suits for long-concluded nuisance abatements.

Second, property owners rarely invoke the right to appeal.[28] This may be due to the correctness of the nuisance finding, to the time and expense involved,[29] or to the Local Government Code's narrow thirty day window for seeking review. *See* TEX. LOC. GOV'T CODE § 214.0012(a) (requiring appeals to be filed within thirty days of order). Or it may be because an unsuccessful appellant must pay the municipality's attorney's fees and costs. *Id.* § 214.0012(h) (requiring appellant to pay municipality's attorney's fees, costs, and

expenses, if municipality's decision is affirmed or "not substantially reversed").

Third, and perhaps most importantly, de novo review is required only when a nuisance determination is appealed. Thus, the City need not institute court proceedings to abate every nuisance. Rather, the City must defend appeals of nuisance determinations and takings claims asserted in court by property owners who lost before the agency. Given these considerations, we disagree with the City's and the amici's characterization of the effects of our holding.

## IV. Conclusion

That the URSB's nuisance determination cannot be accorded preclusive effect in a takings suit is compelled by the constitution and *Steele*, by *Lurie* and its antecedents, by the nature of the question and the nature of the right. The protection of property rights, central to the functioning of our society,[30] should not—indeed, cannot—be charged to the same people who seek to take those rights away.

■ Because we believe that unelected municipal agencies cannot be effective bulwarks against constitutional violations, we hold that the URSB's nuisance determination, and the trial court's affirmance of

---

**28.** The amici have provided some anecdotal evidence on this point. The City of Fort Worth states that over the past ten years it has brought 1,250 cases to its Building Standards Commission, and fewer than ten of those were appealed to district court. The City of Sulphur Springs has abated 86 structures by demolition over the past five years; in 68 of those abatements, the property owner acquiesced in the demolition order. The City of Mesquite has taken 18 cases to its Building Standards Board since 2009. Of those 18, 15 were ordered demolished, and 14 have been demolished. The one remaining property is apparently the only one in which the owner appealed the case to district court, and that

appeal has been dismissed for want of prosecution.

**29.** This includes not just litigation costs, but also the civil penalties municipalities can assess against property owners who fail to comply with repair or demolition orders. *See, e.g., Freeman*, 242 F.3d at 645 (noting that the URSB could impose penalties of up to $2000 per day) (citing DALLAS, TEX. CODE ch. 27, art. II, § 27–8).

**30.** *See, e.g.*, JOHN LOCKE, SECOND TREATISE OF GOVERNMENT 133 (2004) ("The reason why men enter into society is the preservation of their property. . . .").

that determination under a substantial evidence standard, were not entitled to preclusive effect in Stewart's takings case, and the trial court correctly considered the issue de novo.

We affirm the court of appeals judgment. Tex.R.App. P. 60.2(a).

Justice JOHNSON delivered a dissenting opinion, joined by Justice WAINWRIGHT, Justice GREEN, and Justice GUZMAN.

Justice GUZMAN delivered a dissenting opinion, joined by Justice WAINWRIGHT, Justice GREEN, and Justice JOHNSON.

Justice JOHNSON, joined by Justice WAINWRIGHT, Justice GREEN, and Justice GUZMAN, dissenting.

The finding by Dallas's Urban Rehabilitation Standards Board (URSB) that Heather Stewart's property was a nuisance, when affirmed by the trial court, should have determined the nuisance question and precluded its relitigation. Because the Court holds otherwise, I respectfully dissent.

## I. General

Statutory requirements afford significant safeguards to property owners whose property a city seeks to abate as a public nuisance. *See* Tex. Loc. Gov't Code chs. 54, 214. Stewart does not claim that Dallas's ordinances failed to comply with those requirements; neither does the Court. Stewart simply claims that she is constitutionally entitled to an entirely new consideration of whether her property was a nuisance—a trial de novo—instead of the consideration by the URSB with judicial review under the substantial evidence standard. The Court agrees; I do not.

## A. Law

The statutory framework providing abatement of public nuisances is detailed and comprehensive. The Local Government Code specifies that municipalities may provide for abatement of certain types of buildings:

(a) A municipality may, by ordinance, require the vacation, relocation of occupants, securing, repair, removal, or demolition of a building that is:

(1) dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare;

(2) regardless of its structural condition, unoccupied by its owners, lessees, or other invitees and is unsecured from unauthorized entry to the extent that it could be entered or used by vagrants or other uninvited persons as a place of harborage or could be entered or used by children; or

(3) boarded up, fenced, or otherwise secured in any manner if:

(A) the building constitutes a danger to the public even though secured from entry; or

(B) the means used to secure the building are inadequate to prevent unauthorized entry or use of the building in the manner described by Subdivision (2).

*Id.* § 214.001(a). A city governing body is authorized to appoint a building and standards commission to hear cases concerning alleged violations of ordinances. *Id.* § 54.033(a). The commission is afforded independence in fulfilling its functions: members are removable only for cause on written charge and the member is entitled to a public hearing on the removal issue. *Id.* § 544.033(c). The commission must adopt rules and procedures for use in hearings and provide "ample opportunity for presentation of evidence and testimony by respondents or persons opposing

charges brought by the municipality or its building officials." *Id.* § 54.034(b), (d). Further, the chair of the reviewing panel has the authority to administer oaths and compel attendance of witnesses. *Id.* A city may provide that if property is determined by the commission to be in violation of city ordinances and the property is not timely brought into compliance or demolished by the owner, then the property is subject to abatement by the municipality. *Id.* §§ 214.001(d), (h), (i), (j), (m). As relevant to this matter, Dallas's ordinances conformed to the statutory provisions. *E.g.,* DALLAS TEX.CODE §§ 27–6 to –9.[1]

## B. The Hearings

Pursuant to the Local Government Code and Dallas's ordinances, the URSB gave Stewart notice of the alleged code violations regarding her property. The URSB then held an evidentiary hearing concerning the allegations that Stewart's house was an urban nuisance.

Dallas's ordinance defined "urban nuisance" as follows:

> URBAN NUISANCE means a premises or structure that is dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare.

DALLAS TEX.CODE § 27–3(24). *See* TEX. LOC. GOV'T CODE § 214.001(a)(1). After hearing evidence on September 24, 2001, the commission found based on a preponderance of the evidence that Stewart's house was an urban nuisance as defined in section 27–3(24) of the Dallas City Code. Stewart did not appear at the hearing, but after the order was entered she requested a rehearing and filed a plan for repairing the house to remedy the specified code violations. The URSB held another hearing on September 23, 2002: The transcript of the second hearing shows that Stewart and her mother appeared and gave testimony contesting the nuisance allegations. The City presented evidence that no substantial repairs had been made to Stewart's property since the first hearing. As a result of the second hearing the URSB affirmed its September 24, 2001 order.

## C. The Lawsuits

As she was authorized to do by statute and Dallas's ordinances, Stewart timely appealed to the district court. She made several arguments before the district court, but she did not, at that time, argue review of the URSB's determination under the substantial evidence standard violated her constitutional rights. She alleged that (1) the URSB's decision was not reasonably supported by substantial evidence; (2) the URSB actions denied her "due process of law and the right to equal protection of the law, as guaranteed by the Constitutions of the United States and the State of Texas *in that [Stewart] has not been served an order specifying in detail the findings of the Board* " (emphasis added); (3) the URSB exceeded its statutory authority because it did not apply the correct standards in making its ruling; (4) the procedures of the URSB were unlawful in that Stewart was denied the right to cross-examine a city expert witness and a third party witness; and (5) the URSB ignored the evidence and its decision was arbitrary, capricious, and an abuse of discretion.

After the City demolished the property, Stewart amended her pleadings to allege that (1) the URSB's decision was not reasonably supported by substantial evidence; (2) there were "Errors in Procedure and

1. Some provisions of the Code have been amended. References will be to code language applicable to this matter.

Due Process as to Order and Demolition" because the URSB did not follow the notice procedures in section 27–13 of Dallas's ordinances before demolishing her property; (3) demolition of her property was wrongful because there was not substantial evidence to support the URSB's order; and (4) the demolition of her property was an unlawful government action, comprising a "taking" of her property under the Fifth and Fourteenth Amendments of the federal constitution and article 1 of the Texas Constitution, and was "without due process of law."

After the trial court severed the administrative appeal from her other claims, Stewart pled that she was entitled to damages for the wrongful destruction of her property based on "constitutional claims associated with" the City's destruction of her home. As the basis for damages, she alleged generally that demolition of the property as a public nuisance was wrongful, and her claims were brought under "the Texas Constitution, Article 1, Sections 17 and 19." She specified that the bases for her general claim of unconstitutionality were (1) the property was not a nuisance in fact and its destruction "violated the protections afforded Plaintiff by the Texas Constitution and Texas Government Code"; (2) whether her property was a nuisance was a justiciable question to be determined only by the district court or jury trying the case; and (3) Dallas did not give proper notice before demolishing the property, which violated her right to due process. She sought damages for value of the property and mental anguish.

The district court was authorized by statute to conduct a substantial evidence review, and to "reverse or affirm, in whole or in part, or … modify the decision brought up for review." TEX. LOC. GOV'T CODE § 214.0012(f). After severing Stewart's appeal of the URSB's order from her constitutional claims, the court affirmed the URSB order without altering or modifying it. Stewart did not appeal that ruling.

In this severed matter the trial court submitted two liability questions and damages questions contingent on "Yes" answers to the liability questions. The first liability question, question one, charged the jury to find from a preponderance of the evidence if Stewart's property constituted a public nuisance at the time it was demolished by the City. The second liability question, question three, asked if the city failed to comply with section 27–13 of its ordinances in proceeding with the demolition of Stewart's property. Stewart's only objection to the charge was to request that the court define "public nuisance" in question one according to the definition in Dallas's ordinance. The jury answered question one "No" and found the market value of the structure was $75,707.67 at the time it was demolished. Regarding Stewart's due process claim, the jury answered question three "No." Stewart moved the trial court to render judgment in her favor on the verdict of the jury, which it did. Thus, as to the nuisance issue the jury charge submitted the same question to the jury that the URSB previously answered, and the jury made its findings by a preponderance of the evidence—the same standard by which the URSB made its findings.

## II. The Court's Holding

The Court recognizes and agrees that the government does not commit a taking when it abates a public nuisance. 361 S.W.3d at 566. But the Court allows Stewart to circumvent the URSB's determination that her house was a nuisance and the trial court's affirmation of that determination pursuant to its substantial evidence review despite the fact that Stew-

art has never directly attacked the validity of either the statutes involved or Dallas's ordinances that (1) define a nuisance, (2) allow determination of the factual nuisance issue by the URSB pursuant to specified procedures and the definition of nuisance prescribed by the Legislature, and (3) provide for substantial evidence review by a trial court that is authorized to reverse or modify the URSB's order in whole or in part. Nevertheless, her position clearly is that they are invalid: "The question as to whether or not [Stewart's] home was a nuisance is a justiciable question to be determined alone by a court or jury trying the case." Put differently, she maintains that she is entitled to a de novo determination of the nuisance question despite not having challenged the substance of either the statutes or Dallas's ordinances providing procedural and substantive safeguards for persons whose property is alleged to be a nuisance, define the term nuisance, authorize judicial review of the URSB's quasi-judicial nuisance finding and judicial modification of the URSB order.

Stewart and the Court mainly base their positions on *City of Houston v. Lurie*, 148 Tex. 391, 224 S.W.2d 871 (1949) and several cases preceding *Lurie: City of Texarkana v. Reagan*, 112 Tex. 317, 247 S.W. 816 (1923), *Crossman v. City of Galveston*, 112 Tex. 303, 247 S.W. 810 (1923), *Stockwell v. State*, 110 Tex. 550, 221 S.W. 932 (1920). Based on these cases the Court holds that the URSB's determination that Stewart's house was an urban nuisance as defined by the City ordinance—which reflects the statutory definition—could not stand absent "full judicial review." 361 S.W.3d at 570.

In *Lurie*, Aneeth Lurie refused to tear down two buildings she owned after the city council determined the buildings were nuisances. *Lurie*, 224 S.W.2d at 873. An ordinance provided that if an owner failed

to comply with an order of the city council, "the city attorney 'shall file suit in the proper court against such owner and obtain the necessary orders and process of said court to enforce the orders of the city council.'" *Id.* The ordinance did not provide for judicial review of the council's determination that a property was a nuisance. Pursuant to the ordinance, the city attorney sued Lurie to enforce the council's order. *Id.* The trial court submitted the issue to the jury, which found only one of the two buildings was a nuisance. *Id.* The trial court granted a JNOV, rendered judgment that both buildings were nuisances, and ordered their demolition. *Id.* The court of appeals reversed for jury charge error. *Id.* In this Court, the City argued that the trial court should not have even submitted the issues to the jury. *Id.* at 873–74. Rather, it argued the trial court should have rendered judgment for the City, or alternatively, instructed a verdict for the City because it had introduced substantial evidence reasonably supporting the council's findings. *Id.* Relying on *Crossman* and *Reagan*, this Court rejected the City's argument for application of the substantial evidence rule:

> The authority to decide such a question involves the exercise of judicial discretion, and ordinarily includes the authority to weigh evidence, to make findings of fact, and to apply rules of law. It may well be doubted that a limited review of the facts, as under the substantial evidence rule, would amount to a judicial determination of the justiciable question here involved. Trial under that rule would not establish whether or not the buildings are nuisances, "in the same manner as any other fact." *Certainly we would not be justified in applying the substantial evidence rule to this case when there is nothing in the statutes, including the home rule enabling act, or in the city's charter or in the city's*

*ordinance, expressing an intention that the suit be tried under that rule.*

*Lurie*, 224 S.W.2d at 876 (emphasis added). Thus, the Court's refusal to afford preclusive effect to the council's determination that a property was a nuisance, or to afford substantial evidence review of the council's determination, occurred in the absence of a statute or ordinance providing for substantial evidence review. *Id.*

Similarly, in the cases upon which *Lurie* relied—*Stockwell, Crossman,* and *Reagan*—there was no statute or ordinance providing for judicial review. *See Stockwell*, 221 S.W. at 934; *Crossman*, 247 S.W. at 811; *Reagan*, 247 S.W. at 816–17. *Lurie* and its predecessor cases stemmed from the Court's refusal to recognize a non-judicial nuisance finding as conclusive. *See Lurie*, 224 S.W.2d at 875; *see also Reagan*, 247 S.W. at 817 (refusing to uphold an ordinance that "makes final the determination of the city council on the question as to whether or not the building under investigation is a nuisance"); *Crossman*, 247 S.W. at 813 ("Another vice of this ordinance is that it purports to make the action of the city commissioners, in declaring the building a nuisance, final."). These cases expressed the Court's position that such an approach subjected property rights to disposition by officials "exercising, not judicial powers, but purely executive powers." *Stockwell*, 221 S.W. at 934.

Since those cases were decided, however, the Legislature has enacted statutes authorizing substantial evidence judicial review of similar types of decisions. *See* TEX. LOC. GOV'T CODE § 54.039(f) ("The district court's review shall be limited to a hearing under the substantial evidence rule."); *id.* § 214.0012(f) ("Appeal in the district court shall be limited to a hearing under the substantial evidence rule."). The City of Dallas has incorporated the statutory standard into its ordinance. *See*

DALLAS TEX.CODE § 27–9(e). Thus, in the matter before us, unlike the situations in *Lurie, Stockwell, Crossman,* and *Reagan*, statutes and an ordinance provide a definition of nuisance, procedures for giving notice of and determining whether property falls within the definition of nuisance, judicial review of the nuisance determination, and the standard to be used in any judicial review. *See Cedar Crest #10, Inc. v. City of Dallas*, 754 S.W.2d 351, 353 (Tex.App.-Eastland 1988, writ denied) (distinguishing *Lurie* on these grounds).

Although the Court recognizes that *Lurie* involved the absence of a statutory basis for substantial evidence review, in a footnote of its opinion the Court concludes that the basis of the Court's holding was not statutory; instead, *Lurie* focused on the special nature of the right being protected. 361 S.W.3d at 571 n. 15. I agree that the right involved in *Lurie* was special: it was the constitutional right of a private property owner to be secure from governmental taking of private property without compensation. *See Lurie*, 224 S.W.2d at 874. But the Court subsequently squarely held substantial evidence review valid as applied to this same right.

In *City of Houston v. Blackbird*, 394 S.W.2d 159 (Tex.1965), the City of Houston passed an ordinance that levied assessments against property owners for improvements made to streets abutting their properties. *Id.* at 161. The amount of the assessments were based on the city council's determination that the property owners would receive special benefits from the proposed improvements. *Id.* The property owners filed suit in district court seeking de novo review of the council's determination that their property would be especially benefitted by the improvements. *Id.* On appeal, this Court concluded that the validity of the amount of the assessments involved the takings clause of the

Texas Constitution, yet the property owners were not entitled to de novo review of the council's determinations:

An assessment against property and its owner for paving improvements on any basis other than for benefits conferred and in an amount materially greater than the benefits conferred, violates Sec. 17 of Article 1 of the Constitution of Texas, which prohibits the taking of private property for public use without just compensation. The right to judicial review of acts of legislative and administrative bodies affecting constitutional or property rights is axiomatic. The City of Houston does not question the verity or soundness of this proposition. *What the City does question is the right of respondents in this case to a full-blown de novo trial of the question of benefits. We agree with the City that respondents had no such right; and, accordingly, we agree with the City that respondents were not entitled to a jury trial of the issues in this case* and that the jury's answers to the special issues submitted to them should have been disregarded.

*Id.* at 162–63 (emphasis added) (citations omitted). As the Court noted, the Legislature "precluded judicial review of such acts to the extent of its constitutional power" and the Legislature did not intend to provide "dissatisfied property owners a de novo review thereof." *Id.* at 163. The Court upheld that choice by the Legislature, even though the takings clause was the basis for the property owners' challenge, just as it underlies Stewart's challenge.

Similarly, the Court held in *Brazosport Savings and Loan Ass'n v. American Savings and Loan Ass'n* that parties claiming an agency's decision infringed their vested property rights in franchises had a right to judicial review, but the right was limited to "prov[ing] their allegations that the Commissioner's action was illegal or without support in substantial evidence." 161 Tex. 543, 342 S.W.2d 747, 752 (1961).

The Court discounts the holdings of *Blackbird* and *Brazosport* by reading them as "due process cases alleging improper agency actions implicating property interests." 361 S.W.3d at 572. But in *Blackbird* the Court squarely addressed the issue as one involving the takings clause of the Texas Constitution. *Id.* at 163. The only real distinction between *Blackbird* and *Lurie* is that *Lurie* involved the taking of real property, whereas *Blackbird* involved the taking of money by means of requiring payment of an assessment. But they are both property takings claims, nonetheless. And the result in *Blackbird* depended on the city council's fact-based finding that the abutting landowners' property was especially benefitted by the paving. The Court nevertheless holds that findings of the URSB cannot survive because review was by the substantial evidence standard even though the URSB's decision did not entail interpretation of law or the constitution. And the Court does so despite Stewart's failure to challenge any part of the process provided in Dallas's ordinances as being unconstitutional or violating statutes. Her specific complaint was about the post-hearing, pre-demolition notice required by section 27–13 of Dallas's ordinances, and the jury found against her on that question. She neither complains of how the due process question was submitted to the jury nor challenges the jury's finding on it. To the contrary, she moved for judgment on the verdict without excepting or excluding the due process finding from her motion.

The Court also states that *Blackbird* and *Brazosport* "both predate our decision in [*Steele v. City of Houston*, 603 S.W.2d 786], which recognized an implied constitu-

tional right of action for takings claims." 361 S.W.3d at 572. The Court concludes "*Steele* [ ] undermined their vitality insofar as they give broad deference to the Legislature's determination of remedial schemes for property rights violations." 361 S.W.3d at 572. This statement implies that *Steele* overruled *Brazosport* and *Blackbird.* But *Steele* does not address *Brazosport* and *Blackbird,* nor does it address the Legislature's authorization and establishment of a quasi-judicial process to address public nuisances.

In *Steele,* police sought to flush and capture fugitive prisoners by starting a fire in the house where the fugitives were hiding. 603 S.W.2d at 789. The house burned and the owners sought compensation from the city. *Id.* The case did not involve the propriety of an administrative process involving a limited definition of what comprised a public nuisance and provisions for notice, presentment of evidence, opportunity for rehearing, judicial review of findings and determinations, and even judicial authority to modify the administrative order. *See id.* at 792. Rather, it involved whether the police's burning of the property came within the doctrine of great public necessity. *See id.* ("The defendant City of Houston may defend its actions by proof of a great public necessity."). That doctrine recognizes that a governmental entity may destroy property "[i]n the case of fire, flood, pestilence or other great public calamity, when immediate action is necessary to save human life or to avert an overwhelming destruction of property." *Id.* at 792 n. 2.

In contrast to *Steele,* where the question was whether an emergency existed and property was destroyed without prior proceedings to determine the public nuisance question, statutorily authorized abatement proceedings involve quasi-judicial determinations occurring before destruction of the property and affording procedural and substantive safeguards to property owners. *See* TEX. LOC. GOV'T CODE § 54.034. Situations involving determining whether property was previously destroyed because of great public necessity are different from situations involving destruction of property following proceedings pursuant to statutes and ordinances requiring advance notice, a hearing with the opportunity to challenge the public nuisance determination before destruction, and review by a court empowered to set aside or modify the final order. In my view *Steele* is inapposite. *See, e.g., Crossman,* 247 S.W. at 814; *Stockwell,* 221 S.W. at 935. The Court simply displaces a permissible Legislative decision to prescribe a particular type of judicial review and oversight of the determination that property was a nuisance and the administrative remedy.[2] *See* TEX. LOC. GOV'T CODE §§ 54.039(f), 214.0012(f); *Blackbird,* 394 S.W.2d at 162–63; 361 S.W.3d at 590–91 (Guzman, J., dissenting).

## III. Issue Preclusion

Citing *City of Houston v. Crabb,* 905 S.W.2d 669 (Tex.App.-Houston [14th Dist.] 1995, no writ), the court of appeals held that Stewart was not precluded from asserting a takings claim because the nuisance issues underlying the URSB proceeding and Stewart's takings suit were not identical: the City's nuisance defense required proof "that the demolished structure was a nuisance *on the day* it was demolished," but the URSB "made its nui-

---

2. In an effort to undercut the legitimacy of the URSB's determinations, the Court states that abatement proceedings are necessarily motivated in part by the City's bottom line because the URSB's job is to eliminate un-

sightly conditions adversely affecting the economic value of neighboring property and the City's tax base. 361 S.W.3d at 574 n. 18. But, to be clear, there is no evidence in the record of any impropriety by the URSB.

sance finding over a year before Stewart's house was actually demolished." 360 S.W.3d 517, 518 (emphasis added). But the facts in *Crabb* differ significantly from those before us. In *Crabb* the City of Houston notified Crabb that a building he owned was dangerous and that the City intended to demolish it. *See Crabb*, 905 S.W.2d at 671. Crabb attended a hearing where he maintained that he intended to repair the building and sell the property. *Id.* The City nevertheless issued an order stating that he had to demolish the building or the City would do so. *Id.* One year after the City sent the order to Crabb, a city inspector visited the property and determined that the City should not destroy the structure. *Id.* Crabb then spent $13,000 for repairs to the building, including a new roof, all new walls, and all new fixtures. *Id.* Over a year and a half after the city had first notified Crabb of its intent to do so and after the structure had been repaired, the City unexpectedly demolished it. *Id.* Crabb brought a takings claim and the City argued that its nuisance determination barred his suit. The court of appeals agreed that under the facts Crabb could assert his claim.

Unlike the situation in *Crabb*, the URSB found Stewart's property to be a nuisance in two evidentiary hearings that took place a year apart—the second being a rehearing pursuant to her request. Stewart has never denied adequate notice of both hearings. The transcript of the second hearing shows that Stewart appeared, took part, and even brought a witness who testified on her behalf.

Following its September 2001 hearing, the URSB found by a preponderance of the evidence that Stewart's property was a public nuisance as defined by Dallas's ordinances and the Local Government Code and rendered an order to that effect. The Board specifically reaffirmed the 2001 findings and order on September 23, 2002—again specifically by a preponderance of the evidence—after hearing evidence from the city inspectors, Stewart, Stewart's mother, and the same neighbor who testified in September 2001. At the second hearing, Stewart did not claim that repairs had been made to the property since the first hearing or that she did not have notice of the specific problems that resulted in the determination that the property was a nuisance. She claimed that she had always intended to repair the property, but the extent to which she carried out that intent was to install a fence that she maintained restricted entry to the property. On September 26, 2002, Stewart received written notice that the City intended to demolish the property; on October 17, 2002, a city inspector re-inspected the property and determined that the code violations had not been corrected; and a week later the City's special-projects manager inspected the property and determined that no repairs had been made. On October 28, 2002, a City magistrate signed a judicial warrant authorizing demolition of the property and the demolition took place on November 1, 2002.

As previously noted, Stewart disputed the City's contention that her property was a nuisance, but she did not claim or offer evidence that there had been a substantial change in her property between the time of the URSB's September 23, 2002 finding that the property continued to be a public nuisance and the property's demolition on November 1, 2002. Nor did she seek a court order—which she could have—directing the City to defer any action until after her appeal was complete.

I would hold that under this record, Stewart's takings claim was barred by the URSB's nuisance finding and the trial court's affirming of it. *See, e.g., Igal v. Brightstar Info. Tech. Grp., Inc.*, 250

S.W.3d 78, 87 (Tex.2007) (holding that when the Texas Workforce Commission acted in a judicial capacity in deciding a wage claim, the parties had adequate opportunity to litigate their claims through an adversarial process, and the Commission then decided disputed issues of fact, res judicata will generally apply to the Commission's final orders and bar relitigation of the matters decided); *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721–22 (Tex.1990) (stating that the doctrine of issue preclusion bars "the relitigation of identical issues of fact or law which were actually litigated and essential to the prior judgment"); *Humble Oil & Ref. Co. v. Fisher*, 152 Tex. 29, 253 S.W.2d 656, 661 (1952) (holding that even errors in a previous decision do not "detract from or lessen the conclusive and binding effect of the judgment").

## IV. Conclusion

I would hold that the process provided to Stewart by the URSB proceedings and appellate review of those proceedings and the URSB's order by the substantial evidence standard was sufficient. In this regard I join Justice Guzman's dissent.

I would reverse the judgment of the court of appeals and render judgment that Stewart take nothing.

Justice GUZMAN, joined by Justice WAINWRIGHT, Justice GREEN, and Justice JOHNSON, dissenting.

The upsurge of abandoned buildings caused by the subprime mortgage debacle and the recent recession is well known, as are the difficulties it has caused for cities.[1] Abandoned, vandalized, dangerous buildings constitute a major threat to the safety and vitality of entire neighborhoods.[2] The Legislature has enacted a comprehensive statutory scheme enabling cities to address this complex problem. Central to that scheme, summary nuisance abatement is a crucial, front-line tool for cities to deal with an otherwise overwhelming crisis.[3]

Today, the Court holds that "substantial evidence review of a nuisance determination resulting in a home's demolition does not sufficiently protect a person's rights under Article I, Section 17 of the Texas Constitution," and thus concludes that a party whose real property has been determined a nuisance is entitled to an absolute right to de novo judicial review of the underlying nuisance determination made by an administrative board when the person alleges a taking. By doing so, the Court misses the crux of the constitutional issue here: do the procedures created by the Legislature for abatement of urban nuisances violate the due process rights of property owners? Our nuisance precedents establish that due process does not necessitate a de novo judicial determination that a condition is a nuisance if the Legislature has both (1) properly declared that the condition in question is a nuisance and provided for its summary abatement, and (2) specified a different standard of review of such an abatement. Here, the

---

1. See, e.g., Kristin M. Pinkston, *In the Weeds: Homeowners Falling Behind on Their Mortgages, Lenders Playing the Foreclosure Game, and Cities Left Paying the Price*, 34 S. Ill. U. L.J. 621, 627–33 (2010).

2. Melissa C. King, *Recouping Costs for Repairing "Broken Windows": The Use of Public Nuisance by Cities to Hold Banks Liable for the Costs of Mass Foreclosures*, 45 Tort Trial & Ins. Prac. L.J. 97, 98–101 (2009); *see generally* James Q. Wilson & George L. Kelling, *Broken Windows*, Atlantic Monthly, Mar. 1982, at 29.

3. See, e.g., King, *supra* note 2, at 99; Joseph Schilling, *Code Enforcement and Community Stabilization: The Forgotten First Responders to Vacant and Foreclosed Homes*, 2 Alb. Gov't L.Rev. 101, 129–30 (2009).

Legislature has done both. Moreover, the Court's justifications for requiring de novo review are founded on misinterpretations of the precedents of·both this Court and the United States Supreme Court. Accordingly, I would reverse the court of appeals' judgment, and give preclusive effect over the property owner's takings claim to the administrative board's finding that the house was a nuisance, as confirmed on substantial evidence review by the trial court. I therefore respectfully dissent.

## I. Proper Abatement of a Public Nuisance Does Not Constitute a Taking

### A. Due Process

Although the Court rushes to apply the Takings Clause, the correct inquiry is whether there was proper abatement of a public nuisance, consonant with due process. As the Supreme Court has explained, proper abatement of a public nuisance does not constitute a taking. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); *Samuels v. McCurdy*, 267 U.S. 188, 196, 45 S.Ct. 264, 69 L.Ed. 568 (1925) ("The exercise of the police power by the destruction of property which is itself a public nuisance ... is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner."). Due process distinguishes proper abatement of a nuisance from the improper deprivation of property. *See Samuels*, 267 U.S. at 196, 45 S.Ct. 264; *Crossman v. City of Galveston*, 112 Tex.

303, 247 S.W. 810, 813 (1923) (invalidating on due process grounds an ordinance that made city commissioners' nuisance finding final); *Stockwell v. State*, 110 Tex. 550, 221 S.W. 932, 935 (1920) (concluding that judicial review of administrative determination of what constitutes a nuisance is required because "nothing less would amount to due process of law, without which the Bill of Rights declares no citizen shall be deprived of his property"); *Bielecki v. City of Port Arthur*, 12 S.W.2d 976, 978 (Tex. Comm'n App.1929, judgm't adopted) (reasoning, on review of an ordinance declaring that all dance halls located within 150 feet of residences were nuisances, that "denial of the right of a citizen to so use his property is a deprivation of the property itself, hence falls within the protection afforded by the due process clauses of both State and Federal Constitutions").

Due process is a flexible concept, and its precise requirements depend on the particular situation in question.[4] *Gilbert v. Homar*, 520 U.S. 924, 930, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). In weighing a due process question, we must determine whether the claimant has a property interest requiring protection, and, if so, what process is due. *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 929 (Tex.1995). Here, Heather Stewart had a property interest requiring protection—the demolished house. The only remaining issue under these facts is what process did she have a right to—if the procedure utilized to find that Stewart's house was a nuisance afforded her due process, then as a matter of law there cannot have been a taking. *See Samuels*, 267 U.S. at 196, 45 S.Ct. 264. In this case, the only part of

---

4. The Court asserts that I present no "logical reason" for treating this nuisance case differently from an eminent domain case. 361 S.W.3d at 575 n. 21. To the contrary, the distinction is not only logical, it is followed by the Supreme Court. *See Samuels*, 267 U.S. at 196, 45 S.Ct. 264. The exercise of eminent domain is not the same thing as nuisance abatement. *Compare generally* 54 Tex. Jur.3d *Nuisances* (2010), *with* 32 Tex. Jur.3d *Eminent Domain* (2008).

the process afforded to Stewart that she challenges is the Legislature's determination that review of the Dallas Urban Rehabilitation Standards Board's (the Board) nuisance finding is governed by the substantial evidence rule. *See* Tex. Loc. Gov't Code § 214.0012(f).

## B. The Legislature's Authority to Abate Nuisances

For over a century, this Court has recognized the Legislature's authority to determine that a condition is a nuisance, and to provide for its summary abatement. As far back as 1876, we explained that the Legislature could declare that wooden buildings are nuisances under certain circumstances, and could so authorize their abatement. *See Pye v. Peterson*, 45 Tex. 312, 313–14 (1876) (holding that a city could not treat wooden buildings as nuisances absent a specific grant of such authority from the Legislature). This understanding is consistently echoed in our subsequent decisions. *See Crossman*, 247 S.W. at 812; *Stockwell*, 221 S.W. at 934 ("The State, in the exercise of its public power, may denominate certain things to be public nuisances, and because of their having that character provide for their summary abatement.").

Consequently, we have long recognized that the Legislature, pursuant to its authority to declare and abate nuisances, can confer to agencies or municipalities (by statute or grant of authority, as in a municipal charter) the ability to abate a specified nuisance, as defined by the legislative grant. *See Crossman*, 247 S.W. at 812; *Pye*, 45 Tex. at 314 (noting that the Legislature has the power to authorize municipalities to prohibit wooden buildings as nuisances). There are, however, limits to the Legislature's authority.

First, the Legislature cannot declare something a nuisance that is not so in fact. *City of Houston v. Lurie*, 148 Tex. 391, 224 S.W.2d 871, 874 (1949) (" 'This power is limited to declaring only those things to be such nuisances which are so in fact, since *even the State may not denounce that as a nuisance which is not in fact.*' " (quoting *Crossman*, 247 S.W. at 814)); *Crossman*, 247 S.W. at 812 ("Not even the Legislature can declare that a nuisance which is not so in fact."). A "nuisance in fact" is a condition that "endangers the public health, public safety, public welfare, or offends the public morals." *State v. Spartan's Indus., Inc.*, 447 S.W.2d 407, 413 (Tex.1969). It is an otherwise unoffending condition that becomes a nuisance "by reason of its circumstances or surroundings." 54 Tex. Jur.3d *Nuisances* § 5 (2010). In other words, the Legislature may not declare a condition to be a nuisance that, by reason of its circumstances, does not endanger public health, safety, welfare, or morals.

Second, the Legislature cannot delegate an open-ended authority to define nuisances to agencies or municipalities; rather, in authorizing abatement, the Legislature itself must define the nuisance in question. *See City of Texarkana v. Reagan*, 112 Tex. 317, 247 S.W. 816, 817 (1923); *Stockwell*, 221 S.W. at 934. That grant is further subject to a due process requirement of judicial appeal when an agency or municipality acts under such legislative authorization. *See Crossman*, 247 S.W. at 813; *Stockwell*, 221 S.W. at 935; *see also Brazosport Sav. & Loan Ass'n v. Am. Sav. & Loan Ass'n*, 161 Tex. 543, 342 S.W.2d 747, 750–51 (1961).

The Court concludes that only a court is competent to ultimately determine whether a building is a nuisance, and that any such determination by an agency is always subject to de novo review, despite a legislative determination that the substantial evidence rule should apply. Though I agree with the Court that a nuisance determination is *generally* "a justiciable

question," *Crossman*, 247 S.W. at 813, our precedents do not require de novo judicial determination in every case of this nature in order to satisfy due process. A survey of our precedents in this area instead demonstrates that de novo review is *not* required if the Legislature has *both* (1) properly defined the nuisance and authorized its abatement, and (2) provided for a different standard of review of such an abatement.

In *Stockwell*, the commissioner of agriculture did not merely determine that the particular hedge in question was a nuisance; instead, he determined that the *type* of citrus disease infecting the region was a nuisance under the general, catch-all provision of the statute in question. *See Stockwell*, 221 S.W. at 934. In other words, the commissioner effectively set the boundaries of his own authority by defining for himself what constituted a nuisance. *See id.* We held that Stockwell had a right to a judicial determination of whether citrus canker was a nuisance because the Legislature had not defined it as one, not because that right exists always and in every circumstance.[5] *See id.* at 935.

Similar issues confronted this Court in *Crossman*. The principal due process defect in that case was that the municipality lacked authorization from the Legislature to abate the type of nuisance in question. *See Crossman*, 247 S.W. at 811–12. Specifically, the Legislature, through the city's charter, had defined and authorized the abatement of wooden buildings constituting a fire hazard, but had not authorized the abatement of buildings that were

merely dilapidated. *Id.* Accordingly, we held that a city ordinance, purporting to authorize the abatement of dilapidated buildings, was invalid for exceeding the authority given to the city by the Legislature. *Id.* at 812.

In *Reagan*, we invalidated another city ordinance, holding that "this ordinance, in so far as it makes final the orders of the city council declaring the building a nuisance ... is void." *Reagan*, 247 S.W. at 817. Once again, the municipality in question lacked proper legislative authorization *defining* the nuisance in question. *See id.* at 816 (noting that the city council was purportedly "authorized by its charter to *define* and abate nuisances," and questioning the validity of the charter accordingly) (emphasis added).

Finally, in *Lurie*, we twice recognized the Legislature's authority to declare a condition to be a nuisance. *Lurie*, 224 S.W.2d at 875 (noting that judicial determination that a condition is a nuisance is required unless it is "property ... within the class designated and condemned by statute ... as a nuisance"); *id.* at 877 ("*[U]nless* property is of the class *condemned by statute* ... as a nuisance, the question whether it is in fact a nuisance is for judicial determination.") (emphasis added). We also construed—without any doubts as to its validity—the specific statute the Legislature had enacted pursuant to that power, authorizing the abatement of defined nuisances: "dangerous or dilapidated buildings or buildings [constituting a] fire hazard." *Id.* at 874. We observed:

---

5. The *Stockwell* opinion clearly distinguished between (1) the commissioner's determination that citrus canker was a nuisance generally, and (2) the particular finding that Stockwell's hedge should be destroyed as a result. *See Stockwell*, 221 S.W. at 935 ("Viewing the powers given the Commissioner by this statute and his attempted exercise of them here,

the inquiry naturally arises as to what are the rights of the defendant if the Commissioner was mistaken in his judgment that citrus canker was a contagious plant disease, destructive of citrus fruits, *or* as to its being necessary to destroy ... all of the trees in the defendant's hedge.") (emphasis added).

" 'The State, in the exercise of its public power, may denominate certain things to be public nuisances, and because of their having that character provide for their summary abatement.' " *Id.* (quoting *Crossman,* 247 S.W. at 814).

Thus, although *Lurie* goes on to state there is a right to judicial determination of whether a property is a nuisance, that right only arises when the Legislature or common law has not already defined the class of things in question as a nuisance. *Id.* at 875, 877. Of course, where the Legislature has made such a determination, due process still guarantees a qualified judicial review, but does not require that the review be de novo. *Cf. City of Houston v. Blackbird,* 394 S.W.2d 159, 160–61 (Tex.1965). Nor did *Lurie* announce any general right to de novo appeal. Instead, it simply declined the city's invitation in that case to limit appeal to substantial evidence review without guidance from the Legislature, based *in part* on the importance of the rights in question, but equally on the lack of legislative authorization. *See Lurie,* 224 S.W.2d at 875–76. Therefore, under *Lurie,* due process does not require that the judicial review be de novo, if the Legislature, in its grant of authority to abate a defined nuisance, has provided for a lesser standard of review. *See id.* at 876 (declining to apply substantial evidence review because no statute authorized doing so).

Here, the Legislature has authorized cities to abate a particular nuisance, and has specifically defined it as:

> [A] building that is: (1) dilapidated, substandard, or unfit for human habitation and a hazard to the public health, safety, and welfare; (2) regardless of its structural condition, unoccupied by its owners, lessees, or other invitees and is unsecured from unauthorized entry to the extent that it could be entered or used by vagrants or other uninvited persons as a place of haborage or could be entered or used by children; or (3) boarded up, fenced, or otherwise secured in any manner if (a) the building constitutes a danger to the public even though secured from entry; or (b) the means used to secure the building are inadequate to prevent unauthorized entry or use of the building in the manner described in Subdivision (2).

Tex. Loc. Gov't Code § 214.001(a)(1)–(3). This definition of what constitutes a nuisance is specific, and constitutes a nuisance in fact. *See Spartan's Indus.,* 447 S.W.2d at 413 (observing that a nuisance in fact is a condition that "endangers the public health, public safety, public welfare, or offends the public morals"). Thus, unlike the statute in *Stockwell,*[6] or the charter in *Reagan,*[7] the grant in question here is

---

6. The Court inappropriately reasons that the statutes in *Stockwell* and in this case are equivalently broad, *see* 361 S.W.3d at 569–70, but they are not. The relevant statute in *Stockwell* was a general, catch-all provision: " 'or other injurious insect pests or contagious diseases of citrus fruits.' " *Stockwell,* 221 S.W. at 934 (quoting former Tex. Civ. Stat. art. 4459). By contrast, as discussed above, the statute here (1) specifically defines the nuisance, (2) is limited by its terms to nuisances in fact, and (3) contains no catch-all provision such as the one in *Stockwell. See* Tex. Loc. Gov't Code § 214.001(a)(1)–(3). Thus, unlike the statute in *Stockwell,* the statute here would not permit the Board to determine that a building is a "nuisance" when that building is not a nuisance in fact, nor does the statute purport to give the Board authority to determine what kind of condition is a nuisance.

7. The Court's comparison of the charter in *Reagan* and the instant statute also fails. The charter in *Reagan* was not limited to nuisances in fact because *any* dilapidated building could purportedly be demolished pursuant to the charter, and the *Reagan* Court accordingly suggested that the charter was invalid on this point because not even the Legislature can declare something a nuisance

circumscribed to specific conditions that constitute a nuisance in fact, and the municipality or agency is not allowed to define the nuisance. Further, the authorization specifies that judicial review is limited by the substantial evidence rule, TEX. LOC. GOV'T CODE § 214.0012(f), which stands in stark contrast to the situation in *Lurie,* where the statute was silent as to the standard of review, *see Lurie,* 224 S.W.2d at 874, 876.

As Justice Johnson notes in his dissent, the Court effectively overturns the statutory system created by the Legislature to facilitate nuisance abatement. This is especially troubling because the Legislature appears to have made every reasonable effort to draft these statutes in accordance with the relevant standards pronounced by Texas courts, including other due process requirements not at issue here. In particular, the statutes provide for: (1) notice and hearing, *compare* TEX. LOC. GOV'T CODE § 214.001(b)(2)–(3), *with Perry v. Del Rio,* 67 S.W.3d 85, 92 (Tex.2001), (2) a chance to remedy the nuisance, *compare* TEX. LOC. GOV'T CODE § 214.001(d), *with Crossman,* 247 S.W. at 812, (3) notice to mortgagees and lienholders, *compare* TEX. LOC. GOV'T CODE § 214.001(h), *with State Bank of Omaha v. Means,* 746 S.W.2d 269, 270

(Tex.App.-Texarkana 1988, writ denied), (4) a right to judicial appeal, *compare* TEX. LOC. GOV'T CODE § 214.0012, *with Blackbird,* 394 S.W.2d at 161; *Crossman,* 247 S.W. at 813; *Stockwell,* 221 S.W. at 934–35, and (5) a clear definition of what constitutes a nuisance in this context, *compare* TEX. LOC. GOV'T CODE § 214.001(a)(1)–(3), *with Stockwell,* 221 S.W. at 934–35.

In addition, there is no need for the novel course the Court embarks on today. Although there are important *substantive* rights behind the procedural issue in this case—i.e., rights under the Takings Clause—creating a new *procedural* entitlement to protect such rights is unnecessary. The right to compensation for takings of private property is a vital one, as evidenced by its enshrinement in both the Federal and Texas Constitutions. Without reservation, I share the Court's laudable concern with preventing uncompensated takings. As such, I note that even under substantial evidence review, it is still possible to prove that an agency's or municipality's action is illegal, *see Brazosport Sav. & Loan Ass'n,* 342 S.W.2d at 752, which might well be relevant if an agency or municipality acts outside of its authority, as by using the nuisance procedures to actually take title to a piece of real proper-

---

that is not so in fact. *See Reagan,* 247 S.W. at 817; *Stockwell,* 221 S.W. at 934. But here, section 214.001 *is* limited to conditions that are nuisances in fact.

The Court attempts to explain away this distinction by invoking the last antecedent rule to misconstrue section 214.001 as allowing demolition of homes for merely being "dilapidated" or "substandard," and reasons that the definition is thus not limited to nuisances in fact. 361 S.W.3d at 571 n. 14. However, that canon of construction is " 'neither controlling nor inflexible.' " *Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000) (quoting *City of Corsicana v. Willmann,* 147 Tex. 377, 216 S.W.2d 175, 176 (1949)). Moreover, the Legislature is presumed to know existing law when it enacts a

statute, *Acker v. Tex. Water Comm'n,* 790 S.W.2d 299, 301 (Tex.1990), and when the Legislature enacted section 214.001 in its current form, it was already established that being dilapidated alone does not make a building a nuisance in fact, *Crossman,* 247 S.W. at 812. Thus, the Court, by construing the statute to authorize abatement of buildings merely for being substandard or dilapidated, imputes to the Legislature an intent it is presumed not to have. When read fairly and as a whole, Local Government Code section 214.001 displays a clear intent by the Legislature to only authorize abatement of nuisances in fact, that is, conditions that are actually dangerous to public health, safety, and welfare.

ty, or by violating the procedures in Local Government Code chapters 54 and 214, or other statutes. Accordingly, our system already provides adequate safeguards for property owners, without thwarting the intent of the Legislature as the Court does.

In summary, the Legislature has both (1) validly defined the nuisance in question and authorized its abatement, TEX. LOC. GOV'T CODE § 214.001, and (2) specified what standard of review applies, *id.* § 214.0012(f). As a result, I would conclude that the urban nuisance statutes at issue comport with our nuisance precedents, and therefore afforded Stewart due process, and thus should have precluded Stewart's takings claim.[8]

## II. The Court's Reasons for Disregarding our Nuisance Jurisprudence Fall Short

The Court circumvents our due process nuisance jurisprudence discussed above in favor of a takings inquiry. Its justifications for doing so are (1) a misreading of the extent of our holding in *Steele v. City of Houston*, and (2) an entirely novel application of the constitutional fact doctrine. Both of these justifications fail.

### A. Misplaced Reliance on *Steele*

The Court argues that the *Stockwell–Lurie* line of cases described above is no longer valid in light of *Steele v. City of*

*Houston,* 603 S.W.2d 786 (Tex.1980). This exaggerates the scope of *Steele.* The Court cogently describes *Steele*'s actual effect, which was to make clear that the Takings Clause is self-executing, thereby reversing the prior assumption that the State enjoyed sovereign immunity from takings claims. But the Court then extrapolates that *Steele* also precluded the Legislature from summarily abating nuisances in fact. The problem with that assumption is that *Steele* in no way modified or curtailed the State's police power; instead, it merely removed the shield of sovereign immunity from the exercise of that power. *See id.* at 791 ("The Constitution itself is the authorization for compensation for the destruction of property and *is a waiver of governmental immunity* for the taking . . . of property for public use.") (emphasis added).

In fact, *Steele* says very little about the question in this case—in *Steele,* there was no due process at all, because the Houston police summarily set fire to the plaintiff's home in an attempt to flush out fugitives, *id.* at 789, nor was the city claiming to abate a nuisance, *see generally id. Steele* simply stands for the proposition that the Takings Clause is self-executing, and that sovereign immunity is waived for takings claims. *See id.* at 789. An important

---

8. The Court asserts that the general rule of de novo determination or review of nuisance findings is "unlikely ever to apply again" under my approach. 361 S.W.3d at 569 n. 12. But there are many types of nuisance beyond the narrow scope of the Legislature's authorization of abatement of certain urban nuisances at issue here. For example, there are such traditional nuisance actions as abatement of extremely loud noises, *see, e.g., Estancias Dallas Corp. v. Schultz,* 500 S.W.2d 217, 218 (Tex.Civ.App.-Beaumont 1973, writ ref'd n.r.e.), or smells from a cattle feed lot, *see, e.g., Meat Producers, Inc. v. McFarland,* 476 S.W.2d 406, 409 (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.), neither of which fall within

the definition of urban nuisance found in section 214.001 of the Local Government Code. Such suits are real and recurring, and will continue to be governed by the general rule—that whether the condition is a nuisance is a judicial question. This is because *Stockwell* and its progeny make clear that the Legislature must specifically define the nuisance in order to provide for its summary abatement. *See Stockwell,* 221 S.W. at 934. The Legislature has done so here, and it is precisely because the definition is *specific* that the statutory scheme does not cover vast areas of nuisance law—leaving the general rule intact in most instances.

point, to be sure, but one that is not relevant where, as here, the Takings Clause is inapplicable because there was a proper nuisance abatement, rather than a taking. *See Samuels*, 267 U.S. at 196, 45 S.Ct. 264.

## B. The Constitutional Fact Doctrine

The Court further reaches its conclusion by a novel adoption and application of the constitutional fact doctrine. But there are two important reasons that I would decline to import that doctrine from its proper, federal context.

First, the doctrine is generally applied in the context of the First and Fourth Amendments, not to nuisance or takings questions, as the Court itself admits. 361 S.W.3d at 577; *see, e.g., Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). The common thread in those cases is that the "fact" in question is of highly subjective intent—such as whether an alleged defamer acted with actual malice, or whether the police had probable cause. *See Bose Corp.*, 466 U.S. at 515, 104 S.Ct. 1949 (Rehnquist, J., dissenting) (noting that the constitutional fact issue in a First Amendment case is "no more than findings about the *mens rea* of an author"). Also, such cases involve the *development* and application of complicated, constitutional legal standards. *See Ornelas*, 517 U.S. at 697, 116 S.Ct. 1657 (explaining that "the legal rules for probable cause and reasonable suspicion acquire content only through application," thus requiring independent review "if appellate courts are to maintain control of, and to clarify, the legal principles"). By contrast, whether a building is so dilapidated as to constitute a

danger to health and safety is not a legal rule that "acquires content" only through independent judicial review. Rather, it is a rule that derives its content from the specific statute in question. *See* TEX. LOC. GOV'T CODE § 214.001(a)(1)–(3). Indeed, a major concern of our nuisance precedents, such as *Stockwell*, was to ensure that cities and agencies only act under a specific statutory definition, limited to nuisances in fact, thus rendering inapplicable here the concerns that motivated the Supreme Court to "reinvigorate" the constitutional fact doctrine.

Second, the Court's reason for applying the doctrine is disquieting, both for its unsound basis, and for the breadth of its potential application in future cases. The Court applies the doctrine merely because "[t]akings claims also typically involve mixed questions of fact and law." 361 S.W.3d at 578. But mixed questions of fact and law abound in our legal system. *See, e.g., Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 666 (Tex.2009) (Brister, J., dissenting) ("Whether a party prevailed in litigation is a mixed question of law and fact."); *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex.1997) (explaining that probable cause is "a mixed question of law and fact" in malicious prosecution cases when the parties dispute the underlying facts). Under the Court's reasoning, it appears that every mixed question of fact and law that is even alleged to touch on a constitutional right is now a "question of constitutional fact." Further, it is unclear how the Court's decision can be squared with our rule that "[w]e review a trial court's decision on a mixed question of law and fact for an abuse of discretion." [9] *State v.*

---

9. Although the Court asserts that its holding is limited to "review of agency decisions of substantive constitutional rights," and thus "does no violence" to the general rule, 361

S.W.3d at 578 n. 25, that assertion alone does not suffice to cabin the Court's holding, nor does it explicate the relationship between today's opinion and the general rule. The cases

*$217,590.00 in U.S. Currency*, 18 S.W.3d 631, 633 (Tex.2000). What is particularly worrisome is that, while the Supreme Court takes pains to cabin both its reasons for applying the doctrine and the doctrine's scope, this Court today provides no such limiting guidance.[10] *See, e.g., Bose Corp.*, 466 U.S. at 510–11, 104 S.Ct. 1949; *see also* Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L.Rev. 229, 272–73 (1985).[11]

### III. Conclusion

The Court's decision opens the door to a host of takings challenges to agency determinations of every sort, and in every such challenge a right to trial de novo will be claimed. Judges at every level of our court system are invited by today's decision to substitute their own factual determinations for that of an agency or even a lower court. The consequences of the Court's decision will not be limited to the courtroom. As discussed above, cities are faced with complex challenges posed by a crisis level of abandoned and dangerous buildings, and one of the most important weapons provided by the Legislature to combat this problem is summary nuisance

---

cited by the Court on this point, *see id.*, are disparate examples of heightened review in various contexts, and generally do not address the proper framework for review of mixed questions of law and fact in light of the Court's opinion.

10. As a particularly relevant example, the Court's decision today is contrary to *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). In that case, the Supreme Court *limited* the scope of the closely related jurisdictional fact doctrine by noting:

> And where administrative bodies have been appropriately created to meet the exigencies of certain classes of cases and their action is of a judicial character, the question of the conclusiveness of their administrative findings of fact generally arises where the facts are clearly not jurisdictional and the scope of review as to such facts has been determined by the applicable legislation.

*Id.* at 58, 52 S.Ct. 285. *Crowell* thus confined its holding to specifically exclude cases just like this one, where the Legislature has provided for administrative bodies to make quasi-judicial determinations as to nonjurisdictional and nonconstitutional facts, and has specified the appropriate scope of review: that of substantial evidence.

The limitation found in *Crowell* is germane here because, although the Supreme Court was addressing the jurisdictional fact doctrine, that doctrine is an English antecedent of the constitutional fact doctrine, Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L.Rev. 229, 249 (1985), and by applying the jurisdictional fact doctrine in the Ameri-

can, constitutional context, the Supreme Court "both confirmed and generalized the constitutional fact doctrine in strong terms," *id.* at 253. "While conceding that *ordinary facts could be established in the administrative process*, the Court held that constitutional facts must be found by the courts." *Id.* (emphasis added).

11. It is further worth noting that as part of its justification for ignoring the long-established distinction between nuisance abatement and takings, and for invoking the constitutional fact doctrine, the Court relies on *regulatory* takings cases such as *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922 (Tex.1998) and *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802 (Tex.1984). However, the Court fails to properly distinguish between regulatory and conventional takings. Although this is not a takings case, if it were it would be a conventional taking, not a regulatory taking; Stewart's property was destroyed outright, rather than having its value marginally impaired by a regulation. *See Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 672 (Tex.2004).

Because of the differences between regulatory and conventional takings cases, it is generally inappropriate to treat regulatory takings cases as controlling precedent for conventional takings. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002); *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 801–02 (Tex.2005) (per curiam). The Court errs when it relies on such cases here.

abatement. It is therefore unsurprising that the Attorney General and almost a dozen cities have rallied in support of the statutes by appearing as amici curiae.[12]

Because the Legislature has both (1) validly defined the nuisance in question and authorized its abatement, TEX. LOC. GOV'T CODE § 214.001, and (2) specified what standard of review applies, *id.* § 214.0012(f), due process does not require de novo review under our precedents. The Board's finding, pursuant to that authority, as affirmed by the trial court on substantial evidence review, should have precluded Stewart's takings claim. Accordingly, I would reverse the court of appeals and render judgment that Stewart take nothing.

Justice GUZMAN, dissenting from the denial of rehearing.

Abandoned buildings, dilapidated homes and hazardous properties have in many instances become a haven for vagrants, criminal activity and potential hazards to surrounding neighborhood properties. The Court's holding and today's denial of the Motion for Rehearing in effect have essentially decimated summary nuisance abatement—a city's crucial, front-line tool to combat the detrimental effects of nuisance on the health, safety, and welfare of its citizens.[1] The Court's holding leaves municipalities with equally incongruous options after a determination of public nuisance is made by a municipal board: (1) subject the municipality's tax-payers to the otherwise unnecessary and costly litigation of a de novo trial to determine whether the property is a public nuisance; or (2) accept the board's determination, abate, and subject the municipality to a potentially costly takings claim.

Underscoring the risk to the safety and vitality of entire communities, the City of Dallas urges this Court to vacate its holding. Twelve separate amicus briefs have been submitted in support of the Motion for Rehearing.[2] Amici assert that the Court's decision restricts the ability of municipalities to control and regulate nuisances through their police power and in turn restricts municipalities from protecting their communities' health and safety.[3]

**12.** *See* Brief of the State of Texas as Amicus Curiae, *City of Dallas v. Stewart*, No. 09–0257 (Tex. Feb. 3, 2010); Brief of Amici Curiae City of San Antonio, Texas, City of Houston, Texas, In Support of Petitioner City of Dallas, *Stewart*, No. 09–0257 (Tex. Sep. 17, 2009); Brief of Amici Curiae the Cities of Aledo, Granbury, Haltom City, Kennedale, Lake Worth, North Richland Hills, River Oaks, Saginaw and Southlake, Texas, *Stewart*, No. 09–0257 (Tex. May 11, 2009).

**1.** *City of Dallas v. Stewart*, 361 S.W.3d 562, 589 (Guzman, J., dissenting); *see* Melissa C. King, *Recouping Costs for Repairing "Broken Windows": The Use of Public Nuisance by Cities To Hold Banks Liable for the Costs of Mass Foreclosures*, 45 TORT TRIAL & INS. PRAC. L.J. 97, 99–100 (2009).

**2.** The Texas Municipal League (TML), Texas City Attorneys Association (TCAA), and the International Municipal Lawyers Association (IMLA), as well as the cities of Abilene, Aledo,

Cleburne, Euless, Fort Worth, Garland, Granbury, Grapevine, Haltom City, Houston, Hurst, Iving, Kennedale, Lake Worth, McAllen, Mesquite, North Richland Hills, River Oaks, Saginaw, San Antonio, Southlake, and Sulphur Springs submitted a total of twelve amicus curiae briefs in support of the City of Dallas's Motion for Rehearing.

**3.** Brief in Support of Petitioner's Motion for Rehearing for Amicus Curiae, City of Abilene at 8–9, *Stewart*, No. 09–0257 (Tex. Aug. 31, 2011); Brief of Amicus Curiae, the City of Garland, in Support of the City of Dallas's Motion for Rehearing at 1, *Stewart*, No. 09–0257 (Tex. Oct. 13, 2011); Brief of Amicus Curiae, IMLA, in Support of Petitioner's Motion for Rehearing at 13, *Stewart*, No. 09–0257 (Tex. Aug. 23, 2011); Amicus Curiae Brief of the City of Irving in Support of Motion for Rehearing at 10–11, *Stewart*, No. 09–0257 (Tex. Aug. 19, 2011); Brief of Amicus Curiae the City of Sulphur Springs, Texas in

Evidencing the debilitating effects the Court's holding has had in the mere six months since it was handed down, many cities have brought their substandard structure and nuisance enforcement procedures to a stand-still.[4] And many are concerned that this new requirement will delay an already agonizingly slow process.[5]

I believe the cities' concerns warrant closer examination. But, despite the rapid manifestation of the broad-sweeping effects I cautioned about in my dissent, this Court adheres to its untenable holding—despite long-standing precedent dictating otherwise [6]—that a party whose real property has been determined a nuisance is entitled to an absolute right to de novo judicial review of the underlying nuisance determination made by an administrative board when the person alleges a taking.

Because the Court's decision essentially strips municipalities of their legislatively provided tool to combat public nuisance, I would grant the motion for rehearing. Because the Court declines to do so, I respectfully dissent.[7]

Support of Petitioner City of Dallas's Motion for Rehearing at 5, *Stewart*, No. 09–0257 (Tex. Sept. 1, 2011); Brief of Amicus Curiae TML & TCAA in Support of Petitioner City of Dallas's Motion for Rehearing at 2–3, *Stewart*, No. 09–0257 (Tex. Aug. 23, 2011).

**4.** *See, e.g.*, Laura Mueller, *City of Dallas v. Stewart: Divided Supreme Court of Texas Holds That Nuisance Decisions Should Be Made by Courts Rather Than City Boards*, Tex. City Attorneys Ass'n News, June/July 2011, at 3, *available at* http://www.tml.org/legal_tcaa news/News-June-July2011.pdf (stating many cities have halted their nuisance ordinance enforcement until this rehearing is decided) (all Internet materials as visited January 25, 2012 and copy in Clerk of Court's file); Rudolph Bush, *Texas Supreme Court Wants To Hear More About Dallas's Demolition of 'Nuisance' Property*, Dallas Morning News, Oct. 20, 2011, *available at* http://cityhallblog.dallas news.com/archives/2011/10/texas-supreme-court-wants-to-h.html (noting that "[m]any, if not all, of those cities have since stopped destroying nuisance properties absent a court order"); Brief of Amicus Curiae the City of Sulphur Springs, Texas in Support of Petitioner City of Dallas's Motion for Rehearing at 10, *Stewart*, No. 09–0257 (Tex. Sept. 1, 2011) (stating that the city's program to eliminate dangerous and unhealthy structures has ceased as a direct consequence of this Court's holding).

**5.** *See, e.g.*, Ken Fountain, *The Hazard Next Door: Texas Ruling Restricts Cities from Eliminating Blighted Structures*, Bellaire Examiner, Aug. 11, 2011, *available at* http://www.your houstonnews.com/bellaire/news/article_ea69 abc2-115b-5edf-9972-7d4ffc16706e.html (indicating that proceeding with demolition after a board's determination opens the municipality to potential costly litigation); Patricia Kilday Hart, *Hart: Whose Property Rights Are Being Protected?*, The Houston Chronicle, Jan. 7, 2012, *available at* http://www.chron.com/ news/kilday-hart/article/Hart-Whose-property-rights-are-being-protected-2448385.php (suggesting the Court's opinion "has made it more difficult for municipalities to order demolitions of abandoned nuisances," noting that demolition orders—following a nuisance finding by the municipal board—are now likely to only be acted upon when public health and safety risks outweigh the exposure of a takings claim).

**6.** *See Stewart*, 361 S.W.3d at 591 (Guzman, J., dissenting) (explaining that the Court has always recognized the Legislature's capacity to define and abate nuisances and provide for a different standard of review of such abatement).

**7.** *See Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 24–29 (Tex.2007) (Brister, J., dissenting to the denial of rehearing).