

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-12-00098-CV

GOOD SHEPHERD MEDICAL CENTER - LINDEN, INC., Appellant

V.

BOBBY TWILLEY, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 11-C-351

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

While employed as the Director of Plant Operations for Good Shepherd Medical Center – Linden, Inc. (Good Shepherd) in the summer of 2009, Bobby Twilley fell from a ladder attached to the hospital building and was injured.[1]  Twilley alleges he sustained a second on-the-job injury in February 2010, when he tripped and fell over a mound of hardened cement on Good Shepherd's premises.  His lawsuit against Good Shepherd asserts claims of negligence per se,[2] negligence (premises liability to an invitee), and gross negligence.  The lawsuit proceeded as a typical negligence case[3] for over a year, when Good Shepherd filed a motion to dismiss for want of an expert report under the Texas Medical Liability Act (TMLA), which requires that,

> [i]n a health care liability claim, a claimant shall, not later than the 120th day after the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2011).

The trial court denied the motion to dismiss, and Good Shepherd brings this interlocutory appeal.  *See Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008); *Longino v. Crosswhite*, 183 S.W.3d 913, 915 (Tex. App.—Texarkana 2006, no pet.).  Good Shepherd claims that an expert

---

[1]Twilley alleges that, as he reached the top portion of the ladder, his right hand became ensnared between a rung and a gutter behind the ladder, causing him to slip and fall approximately twelve feet.

[2]Twilley contends Good Shepherd is negligent as a matter of law due to an alleged violation of Section 1910.27 of Title 29 of the Code of Federal Regulations, which provides, "The distance from the centerline of rungs, cleats, or steps to the nearest permanent object in back of the ladder shall be not less than 7 inches, except that when unavoidable obstructions are encountered, minimum clearances as shown in figure D–3 shall be provided."  29 C.F.R. 1920.27(c)(4).

[3]Discovery proceeded as in a typical negligence case and primarily centered on the alleged Occupational Safety and Health Administration (OSHA) violations.  OSHA investigates workplace injuries.

2

report is required pursuant to the recent case of *Texas West Oaks Hospital*, *LP & Texas Hospital Holdings*, *LLC v. Williams*, 371 S.W.3d 171 (Tex. 2012). Because the claims here are not even indirectly related to health care—save only that they arose on the premises of a health care provider—we affirm the judgment of the trial court.

We generally review under an abuse-of-discretion standard a trial court's order granting a motion to dismiss for failure to timely file an expert report under Section 74.351(a). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *Am. Transitional Care Ctrs. of Tex.*, *Inc. v. Palacios*, 46 S.W.3d 873, 877–78 (Tex. 2001); *Pedroza v. Toscano*, 293 S.W.3d 665, 666 (Tex. App.—San Antonio 2009, no pet.). However, when the issue presented requires a statutory interpretation or a determination of whether a claim falls under the Act, i.e., questions of law, we use a de novo standard of review. *Williams*, 371 S.W.3d at 177.

Good Shepherd relies primarily on *Williams* for the proposition that, even though Twilley's claims are unrelated to health care, they fall within the ambit of the TMLA. The high court has instructed that, in order to differentiate between ordinary negligence claims and health care liability claims (HCLCs), the courts must focus on the nature of the acts or omissions causing the alleged injuries. *Id*. at 176. Accordingly, a discussion of *Williams* is necessary.

Texas West Oaks, a private mental health hospital, employed Williams as a psychiatric technician and professional caregiver. Williams was assigned to supervise a particular patient who, due to his history of mental problems involving violent behavior, was restricted to his unit, meaning he could be removed from the psychiatric unit only by direct order of a physician. A physical altercation between Williams and the patient occurred when Williams had taken the

3

patient to an outdoor enclosed smoking area in violation of the unit-restriction policy. The altercation resulted in injuries to Williams and the death of the patient. *Id*. at 175.

The patient's family sued the hospital asserting an HCLC under the TMLA. Williams was later named as a defendant in the suit and subsequently filed a cross-claim alleging negligence against the hospital pursuant to the Texas Workers' Compensation Act. Williams alleged the hospital failed to properly train, warn, and supervise him to work with potentially violent psychiatric patients and, as a result, failed to provide a safe workplace. *Id*. at 192–93. West Oaks filed a motion to dismiss based on Williams' failure to provide an expert report in accordance with the TMLA. The trial court denied the motion, and the court of appeals affirmed. The Texas Supreme Court reversed, finding that Williams' claims were HCLCs based on claimed departures from accepted standards of health care and safety. *Id*. at 193.

Two primary holdings of *Williams* are pertinent to our decision here: (1) the lack of a health care relationship between the claimant and the health care provider is not a barrier to the inclusion of a claim within the Legislature's definition of health care liability claims, and (2) "the safety component of HCLCs need not be directly related to the provision of health care . . . ." *Id*. at 179, 186.

In determining that a claimant need not be a patient under the Act, the *Williams* court relied primarily on the modification of the HCLC definition in the 2003 legislation. The italicized portion of the following definition was added in 2003:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to

4

health care, which proximately results in injury to or death of a *claimant*, whether the *claimant's claim or cause of action* sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (West Supp. 2012); *Williams*, 371 S.W.3d at 178. Before 2003, the term "patient" appeared in this definition where the term "claimant" now appears. The court observed that "[c]hanging the term 'patient' to 'claimant' and defining 'claimant' as a 'person' expands the breadth of HCLCs beyond the patient population. This in turn necessarily widened the reach of the expert report requirement, unless otherwise limited by other statutory provisions." *Williams*, 371 S.W.3d at 178. Therefore, "with the exception of medical care and health care claims,"[4] the focus in determining whether a claim comes within the confines of the TMLA is "not the status of the claimant, but the gravamen of the claim . . . ." *Id*. So long as the TMLA's other requirements are met, it "does not require that the claimant be a patient of the health care provider for his claims to fall under the Act." *Id*. at 174. Because the TMLA's other requirements were deemed to have been met, Williams was a claimant. *Id*. at 179.

Likewise, Twilley's status as a nonpatient does not prevent his classification as a claimant, so long as the other requirements of the TMLA are met. As explained below, however, we believe a different vital requirement of the TMLA remains unmet in this case.

Here, the unmet requirement of the TMLA is that this safety claim have at least an indirect relationship to health care. The claim in *Williams* had an indirect relationship to health

---

[4]The court observed that the terms "health care" and "medical care" are separately defined and reference treatment furnished "for, to, or on behalf of a patient." *Williams*, 371 S.W.3d at 178; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(10), (19) (West Supp. 2012).

5

care; Twilley's claim does not. Key to the *Williams* ruling that the petition in that case asserted a safety claim under the TMLA was the determination that, even if a claim is not directly related to health care, it may nevertheless be classified as a claimed departure from accepted standards of safety by a health care provider. *Id*. at 186. "The heart of these cases lies in the nature of the acts or omissions causing claimants' injuries and whether the events are within the ambit of the legislated scope of the TMLA." *Id*. at 176. An HCLC is defined as:

> a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13).

The statute includes a cause of action for a "claimed departure from accepted standards of medical care, or health care, or *safety or professional administrative services directly related to health care*, *which proximately results in injury to or death of a claimant* . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (emphasis added). The high court noted that the term "safety" was in the Act before the 2003 amendments. That term was construed according to its common meaning as "being secure from danger, harm or loss." *Williams*, 371 S.W.3d. at 184 (citing *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 855 (Tex. 2005)). In 2003, the phrase "directly related to health care" was added to the definition to modify "professional or administrative services." *Id*. The high court used the rule of statutory construction known as the

6

last antecedent doctrine[5] to determine that the phrase "directly related to health care" modifies "professional or administrative services," but does not modify the term "safety." *Id*. at 185–86. "Williams' claims are indeed for departures from accepted standards of safety. We conclude that the safety component of HCLCs need not be directly related to the provision of health care and that Williams' claims against West Oaks implicate this prong of HCLCs." *Id*. at 186.

In reaching this conclusion, the high court recognized that Williams' claims against Texas West Oaks centered on the hospital's alleged failure "to properly train, warn and supervise him to work with potentially violent psychiatric patients and, as a result, [the hospital] failed to provide a safe workplace." *Id*. at 192–93. His injuries could have been avoided, claimed Williams, if the hospital would have instituted proper safety protocols and monitoring devices. Accordingly, "Williams' claims, predicated on the monitoring and restraint of violent, schizophrenic patients, implicate the safety, as commonly understood, of employees and patients."[6] *Id*. at 183–84.

Additionally, the court recognized that Williams' claims were similar to those asserted in *Rubio*, 185 S.W.3d 842, in which the court determined that "[p]rofessional supervision, monitoring, and protection of the patient population necessarily implicate the accepted standards of safety." *Id*. at 855. Williams' claims implicated safety because they had to do with "his protection from danger at the hands of a mental patient . . . ." *Williams*, 371 S.W.3d at 185.

---

[5]Under this tenant, a qualifying phrase should be applied only to the portion of the sentence "immediately preceding it." *Id*. (quoting *City of Dallas v. Stewart*, 361 S.W.3d 562, 571 n.14 (Tex. 2012)).

[6]The *Williams* court also determined that the claims in that case were health care claims under the TMLA. We do not address this aspect of the court's opinion, as it is not at issue here.

7

Even though Williams' safety claims were not directly related to health care, such claims were more closely connected to health care than simply arising in a health care context. They were moored to a unique medical environment involving the safety aspects of the relationship between Williams (a health care provider) and the patient he was specifically assigned to supervise. Decisions regarding the appropriate professional supervision, monitoring, and protection of the patient population and health care providers are within the unique province of physicians and health care providers. *See, e.g.*, *Rubio*, 185 S.W.3d at 851. Because Williams' safety claims implicated safety standards required for working with potentially violent schizophrenic patients at a mental health hospital, they were indirectly related to health care. The high court did not, however, address the precise issue here—whether safety claims fall within the purview of the TMLA when they are entirely *unrelated* to health care.

Here, it is undisputed that Twilley was not, at least when he was injured, a recipient of health care, and his position as Director of Plant Operations for Good Shepherd did not involve health-care-related judgments (as in *Williams*). Further, Twilley did not report to a health care provider (as did Williams). The gravamen of Twilley's claims—for OSHA violations—is unrelated to the provision of health care to the patient population or to anyone else. Even under these facts, Good Shepherd contends *Williams* requires the production of an expert report.

8

Good Shepherd frames the issue as "whether the Texas Supreme Court decision in. . . *Williams* extends to employees of a nonsubscribing hospital when there is a personal injury claim regarding a deviation from the accepted standards of *safety* that is unrelated to health care." (Emphasis added.) In contending the answer to the foregoing query is affirmative, Good Shepherd relies on the express statement that "the safety component of HCLCs need not be directly related to the provision of health care . . . ." *Williams*, 371 S.W.3d at 186. Good Shepherd contends that the breadth of this holding encompasses the safety claim at issue here.

In addition, Good Shepherd relies on *Memorial Hermann Hospital System v. Kerrigan*, 383 S.W.3d 611 (Tex. App.—Houston [14th Dist.] 2012, pet. filed). In that case, a hospital security officer, at the request of hospital personnel, intervened to keep a patient (Kerrigan's daughter) in the hospital after she expressed her desire to leave. Kerrigan filed suit against the hospital alleging claims for false imprisonment, assault, and negligence. The hospital moved to dismiss all claims for Kerrigan's failure to provide an expert report. The trial court granted the motion as to the negligence claim, but denied it as to the false-imprisonment and assault claims. *Id.* at 611. On appeal, Kerrigan relied on the Houston court's opinion in *Appell v. Mugerza*, 329 S.W.3d 104, 111–12 (Tex. App.—Houston [14th Dist.] 2010, pet. denied), *abrogated by Williams*, 371 S.W.3d 171, in which the court concluded that "[p]unching and violently throwing patients to the ground or into a cabinet without provocation cannot reasonably be characterized as being part of the medical services provided by a doctor." *Id.* However, in light of *Williams'* holding that the broad terms of Section 74.001 apply to claimed departures from the accepted standards of safety—even if that safety is not directly related to health care, the Houston court

9

questioned the precedential value of *Appell*. Because each of Kerrigan's claims—false imprisonment, assault, and negligence—center on actions taken by hospital employees seeking to keep safe the patient being restrained, as well as other patients and hospital employees, such claims were subject to the expert report requirement. *Kerrigan*, 383 S.W.3d at 611.

*Kerrigan*, like *Williams*, is different from this case. The patient, who had been diagnosed by her physician with acute psychosis and mania, was scheduled to be transferred, on order of her physician, to an in-patient psychiatric facility for her own safety until her mental status stabilized. During the night before the planned transfer, the patient became restless, left her room, and expressed a desire to leave the hospital. To preserve the attending physician's medical care plan and to ensure the safety of the hospital staff and other patients, the treating physicians requested help from hospital security personnel to escort the patient back to her room. *Id*. at 613. The court noted that each of Kerrigan's claims centered on actions taken by hospital employees seeking the safety of the patient, other patients, and hospital employees. Such actions were taken only after the patient was determined to be a danger to herself and others and sought to comply with the physician's medical care plan for the patient. *Id*. at 614.

Despite Good Shepherd's contention to the contrary, we do not believe *Williams* encompasses safety claims that are completely untethered from health care. Certainly, *Williams* does not so state. As previously discussed, the safety claims in *Williams* were at least indirectly related to health care. Good Shepherd's interpretation of the law goes far beyond the holding in *Williams* and would render meaningless the high court's directive that ordinary negligence claims are distinguished from health care liability claims by focusing on the nature of the acts or

10

omissions causing the alleged injuries. *Williams*, 371 S.W.3d at 176. Said differently, if *every* safety claim against a health care provider were considered a health care liability claim, there would be no need to analyze the nature of the acts or omissions which caused the alleged injuries.

Moreover, when Good Shepherd's argument is taken to its logical extreme, a suit against a health care provider for negligence in causing a car accident in a hospital parking lot would involve a safety claim and thus would require a report from a health care practitioner expert. A safety claim must involve a more logical, coherent nexus to health care. The simple fact that an injury occurred on a health care provider's premises is not enough.

Indeed, the high court—although in dicta—so recognized in *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012), a patient assault case decided two months after *Williams*:

> [W]e fail to see how the Legislature could have intended the requirement of an expert report to apply under circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of "medical care, or health care, or safety or professional or administrative services directly related to health care" even though the conduct occurred in a health care context. *See* TEX. CIV. PRAC. & REM. CODE § 74.001(a)(13); *see also* TEX. GOV'T CODE § 311.021 ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . .").

*Id*. at 257. In *Loaisiga*, the court clarified that a claim is not necessarily a health care liability claim merely because a patient is injured by a physician or a health care provider. "In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (*i.e*., the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both." *Id*. at 256 (discussing rebuttable presumption in patient assault cases).

11

If certain assault claims are excluded from the purview of the TMLA because such claims are inconsistent with "medical care, or health care, or safety or professional or administrative services directly related to health care," it is likewise logical to recognize that "safety" claims completely unrelated to health care are likewise excluded from the ambit of the legislated scope of the TMLA.

Moreover, to require an expert report in this case would amount to an exercise in futility. Section 74.351 sets forth the requirement that, in a health care liability claim, a claimant shall serve on each party one or more expert reports for each physician or health care provider against whom a claim is made. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). The expert opinion regarding whether a health care provider departed from accepted standards of health care or safety must come from an expert qualified to testify under the requirements of Section 74.402. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(B) (West 2011).

Section 74.402 essentially requires that, in a suit involving an HCLC against a health care provider, a qualified expert must be

> practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant . . . , has knowledge of accepted standards of care for . . . the diagnosis, care or treatment of the illness, injury or condition involved . . . and is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. REM. CODE ANN. § 74.402(b)(1)–(3) (West 2011). In this case, it would be terribly difficult, if not impossible, to find a qualified expert under the statute who was also competent to opine on the relevant accepted standards of care—OSHA ladder construction and installation and walking surface standards. A medical report here would not shed any

12

light on whether the ladder violated OSHA standards or the concrete mound constituted an unreasonable risk of harm.

Although a safety claim under the TMLA need not be "directly related to health care," the converse—that a safety claim falls within the ambit of the TMLA even when it is completely untethered from health care—is not the way we understand the *Williams* holding. In *Williams*, the safety claim was indirectly related to health care. It was not, as are the claims here, related to health care only in that the claims arose on hospital premises.

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice

Date Submitted:    January 23, 2013
Date Decided:      March 1, 2013